Beth S. **AMONETTE, individually and as trustee of the Beth Snodgrass Amonette Revocable Living Trust, Plaintiff,**

v.

**INDYMAC BANK, F.S.B. and Bridge Capital Corporation, Defendants.**

**Civ. No. 06–00583 SPK–KSC.**

United States District Court, D. Hawai'i.

Sept. 12, 2007.

---

John Harris Paer, Honolulu, HI, for Plaintiff.

Dane L. Miller, Wilma Sur, Miller Toku-yama and Sur, Honolulu, HI, for Defendants.

## ORDER DENYING DEFENDANT IN-DYMAC BANK, F.S.B.'S MOTION TO DISMISS, OR IN THE ALTER-NATIVE, FOR SUMMARY JUDG-MENT

SAMUEL P. KING, Senior District Judge.

Defendant IndyMac Bank, F.S.B. ("In-dyMac" or "Defendant"), moves to dismiss Plaintiff's first amended complaint, or in the alternative, for summary judgment.[1] The matter was argued on August 22, 2007. John Harris Paer appeared for Plaintiff Beth S. Amonette, individually and as trustee of the Beth Snodgrass Amo-nette Revocable Living Trust ("Plaintiff" or "Amonette"). Dane Miller appeared for IndyMac. The primary question is whether Plaintiff, individually or as trustee of her revocable living trust, has standing to assert a claim for alleged violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq. This is apparently an issue of first impression. For the reasons set forth, the Court concludes that the answer is yes. IndyMac's Motion to Dismiss, or in the Alternative, for Summary Judgment is DENIED.

### I.

The motion is directed solely at the threshold legal question whether Plaintiff has standing to make claim under TILA and its corresponding regulations set forth in TILA's "Regulation Z."[2] That is, the underlying merits of the suit (e.g., whether Defendants made proper disclosures, made misleading or false statements, and whether Bridge Capital was acting as an agent of IndyMac) are not before the Court. For present purposes, the Court must assume the allegations of the First Amended Complaint are true, or construe proffered evidence in the light most favorable to the Plaintiff, which the Court does as follows:

Beth S. Amonette (who had transferred her property to her revocable living trust) obtained a refinancing loan of over $400,000 secured by her principal residence. The loan was for personal and

---

1. Co–Defendant Bridge Capital Corporation ("Bridge Capital") has defaulted. Bridge Capital had filed a related motion to dismiss prior to defaulting. Plaintiff had also filed a counter-motion which was directed only against Bridge Capital (the counter-motion was filed before a prior default against Indy-Mac was set aside). Bridge Capital had also joined in the present motion by IndyMac. Because Bridge Capital has defaulted, all its proceedings (its motion to dismiss, its joinder, and the counter-motion) are moot.

2. The question can be stated alternatively as whether Plaintiff has stated a claim under TILA. "Whether litigants are the proper parties to assert a claim depends on whether the statute confers upon them a claim; if they fail to state a claim, by definition they lack statutory standing." *In re Crevier*, 820 F.2d 1553, 1555 (9th Cir.1987) (citation omitted).

consumer uses, not for a business use. After obtaining the loan, she apparently paid off the existing fixed-rate first mortgage and used additional cash to pay down other debts.

Plaintiff previously owned the property as an individual. [Exh. A to Defendant IndyMac's Memorandum in Support of Motion].[3] In May of 2005, she established a revocable living trust, with herself as the settlor and as the trustee. The short form trust agreement contains a standard clause for such trusts, reading "During the Settlor's lifetime, the Settlor retains the unlimited right to withdraw income and principal from the trust." [Exh. B to Defendant IndyMac's Memorandum in Support of Motion]. She then conveyed the property to her revocable living trust, with herself as Grantor and herself (as trustee) as Grantee. [*Id.*]

At some point thereafter, Plaintiff refinanced her home loan. Plaintiff allegedly was promised that her interest rate would be from 1 to 1.5 percent. [First Amended Complaint at ¶ 7]. This amount may have been for the first 5 years of the loan term. [Amonette Declaration of March 12, 2007, at ¶ 7]. It turned out to be about 8 percent over the life of the loan. [Exh. A to First Amended Complaint]. Amonette also paid a pre-payment penalty which she alleges was contrary to what was promised. Bridge Capital solicited the loan. IndyMac issued the loan and holds the note and mortgage.

The record contains a Truth in Lending Disclosure Statement dated August 25, 2006, issued by IndyMac and listing only "Beth Snodgrass Amonette" as the "borrower" (i.e., she was not listed as trustee of a revocable living trust, nor was the revocable living trust itself listed) [Exh. A to Plaintiff's First Amended Complaint]. The loan apparently closed on August 29, 2006 [Amonette Declaration at ¶ 19]. The mortgage, held by IndyMac, is also dated August 25, 2006. It was recorded on September 5, 2006.

The mortgage lists the "borrower" as "Beth Snodgrass Amonette Trustee of the Beth Snodgrass Amonette Revocable Living Trust an unrecorded trust dated May 18, 2005" [without commas]. [Exh. C to Defendant IndyMac's Motion]. The mortgage also contains a "Revocable Trust Rider," providing, among other things, that "[t]he term 'Borrower' when used in the Security Instrument [i.e., mortgage] shall refer to the Revocable Trust Trustee(s), the Revocable Trust Settlor(s), and the Revocable Trust, jointly and severally." [*Id.* at 23].

According to the First Amended Complaint, Plaintiff sought to rescind the loan in writing in September 2006 and by tendering back all amounts owing. Bridge Capital refused to rescind the loan; there was no response from IndyMac. The First Amended Complaint alleges that Bridge Capital acted as loan broker and the agent of both IndyMac and Plaintiff. After the refusal to rescind, Plaintiff filed this suit making claims for unfair and deceptive trade practice violations, and various violations of TILA's disclosure provisions. Plaintiff alleges that the Defendants failed to properly disclose certain terms or disclosed them in a misleading and confusing manner. Plaintiff orally represented to the Court at the hearing that she is current with the monthly payments on the loan, al-

---

**3.** Plaintiff argues that the motion should be denied because IndyMac did not submit a concise statement of facts under Local Rule 56.1(a). The Court, in its discretion, excuses the lack of a concise statement because this is primarily a motion to dismiss on a purely legal issue.

though the payments are set to nearly double in late–2009.

By this Motion, IndyMac contends Plaintiff does not have standing to make a TILA claim because she holds the property in a revocable living trust and the loan was essentially made to the trust. IndyMac argues that TILA only applies to "natural persons" not "organizations" (which TILA defines as including "trusts").

## II.

IndyMac invokes the following exemption from TILA for loans for agricultural purposes, or loan to businesses or organizations:

> This subchapter [4] does not apply to the following:
>
> (1) Credit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes, or to government or governmental agencies or instrumentalities, *or to organizations*
> . . . .

15 U.S.C. § 1603.

In turn, TILA defines "organization" as follows:

> "The term 'organization' means a corporation, government or governmental subdivision or agency, *trust, estate,* partnership, cooperative, or association."

15 U.S.C. § 1602(c) (emphases added).

Similarly, TILA's corresponding Regulation Z provides:

> This regulation does not apply to the following:
>
> (a) Business, commercial, agricultural, or organizational credit. (1) An extension of credit primarily for a business, commercial or agricultural purpose. (2) An extension of credit *to other than a natu-*

*ral person,* including credit to government agencies or instrumentalities.

12 C.F.R. § 226.3(a).

Another way to look at it is that TILA covers "consumer" credit transactions. "Consumer" transactions are defined as those "in which the party to whom credit is offered or extended is *a natural person,* and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1602(h) (emphasis added); *Riviere v. Banner Chevrolet, Inc.,* 184 F.3d 457, 462 (5th Cir.1999).

Citing these provisions, IndyMac argues that because credit was extended to a revocable living trust—a "trust" and therefore an "organization" and not a "natural person"—the transaction is exempt from TILA. IndyMac argues that the Court need look no further than the "plain language" of the statute.

■■ When a statute's language is plain, the Court's function is to enforce it according to its terms. *Lamie v. United States Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004). Nevertheless, "[e]ven where the express language of a statute appears unambiguous, a court must look beyond that plain language where a literal interpretation of this language would thwart the purpose of the overall statutory scheme, would lead to an absurd result, or would otherwise produce a result demonstrably at odds with the intentions of the drafters." *Royal Foods Co., Inc. v. RJR Holdings, Inc.,* 252 F.3d 1102, 1108 (9th Cir.2001) (quoting *In re Magic Rests., Inc.,* 205 F.3d 108, 116 (3rd Cir.2000) (internal citations and quotations omitted)).

---

4. The term "subchapter" refers to TILA itself, i.e., 15 U.S.C. § 1601–1667e. TILA is a "subchapter" of the Federal Consumer Protection Act. *See Sherrill v. Verde Capital Corp.,* 719 F.2d 364, 367 (11th Cir.1983).

That is, in ascertaining "plain language," the Court must do so "construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress." *United States v. Hockings*, 129 F.3d 1069, 1071 (9th Cir. 1997) (quotation omitted). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (citations omitted). "To determine the plain meaning of a particular statutory provision, and thus congressional intent, the court looks to the entire statutory scheme." *DeGeorge v. United States Dist. Court for Cent. Dist. of California*, 219 F.3d 930, 936 (9th Cir. 2000) (quoting *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir.1999)).

Applying those principles of statutory construction, what might appear to be "plain" here is not necessarily so. "Plain meaning, like beauty, is sometimes in the eye of the beholder." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 737, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). While a "revocable living trust" is legally a type of "trust," it is also true that TILA does not specifically define an "organization" as including a *"revocable living* trust." Moreover, Beth S. Amonette herself certainly is a "natural person." In many respects, she (as a "natural person") is the actual "borrower." In reality, credit was offered to *her*, although indisputably she holds the property in her revocable living trust.[5] Accordingly, the Court must look past the mere language of the statute and examine "the provisions of the entire law, including its object and policy, to ascertain the in-

tent of Congress." *Hockings*, 129 F.3d at 1071. The Court must examine "the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341, 117 S.Ct. 843. The Court must "determine whether the language at issue has a plain and unambiguous meaning *with regard to the particular dispute in the case.*" *Id.* at 340, 117 S.Ct. 843 (emphasis added).

## III.

As a comprehensive consumer protection statute, TILA seeks to protect consumers by requiring certain disclosures to consumers for certain types of loans. "Congress designed the law to apply to all consumers, who are inherently at a disadvantage in loan and credit transactions." *Semar v. Platte Valley Fed. Sav. & Loan Ass'n*, 791 F.2d 699, 705 (9th Cir.1986). "Congress through TILA sought to protect consumers' choice through full disclosure and to guard against the divergent and at times fraudulent practices stemming from uninformed use of credit." *King v. California*, 784 F.2d 910, 915 (9th Cir.1986) (citing *Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 363–64, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973)).

TILA is a remedial statute, to be interpreted liberally in favor of the consumer. *Jackson v. Grant*, 890 F.2d 118, 120 (9th Cir.1989) (citing *Eby v. Reb Realty, Inc.*, 495 F.2d 646, 650 (9th Cir.1974)); *see also Riggs v. Government Employees Fin. Corp.*, 623 F.2d 68, 71 (9th Cir.1980) ("It is well established that [TILA] is to be liberally construed to effectuate its remedial purpose.") (citing cases). Thus,

---

**5.** Indeed, as set forth earlier, IndyMac's TILA disclosure statement was given to her as an individual. *See* Exh. A to the First Amended Complaint. In this regard, because the Court denies the motion based upon statutory construction, the Court need not reach Plaintiff's alternative argument that IndyMac is estopped from denying that TILA applies.

"[e]ven technical or minor violations of the TILA impose liability on the creditor." *Semar*, 791 F.2d at 704. " 'To insure that the consumer is protected ... [the TILA and accompanying regulations must] be absolutely complied with and strictly enforced.' " *Jackson*, 890 F.2d at 120 (quoting *Semar*, 791 F.2d at 704) (brackets in original).

Besides the provisions quoted earlier regarding an "organization," other provisions of Regulation Z are pertinent. Regulation Z defines a "consumer" as follows:

> Consumer means a cardholder or a natural person to whom consumer credit is offered or extended. *However, for purposes of rescission under [12 C.F.R.] §§ 226.15 and 226.23, the term also includes a natural person in whose principal dwelling a security interest is or will be retained or acquired, if that person's ownership interest in the dwelling is or will be subject to the security interest.*

12 C.F.R. § 226.2(a)(11) (emphasis added).

In turn, section 226.15 regarding rescission provides:

> (a) Consumer's right to rescind.
>
> (1)(i) Except as provided in paragraph (a)(1)(ii) of this section, in a credit plan in which a security interest is or will be retained or acquired in a consumer's principal dwelling, *each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind:* each credit extension made under the plan; the plan when the plan is opened; a security interest when added or increased to secure an existing plan; and the increase when a credit limit on the plan is increased.

. . . .

> (3) The consumer may exercise the right to rescind until midnight of the third business day following the occurrence described in paragraph (a)(1) of this section that gave rise to the right of rescission, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures, whichever occurs last. *If the required notice and material disclosures are not delivered, the right to rescind shall expire 3 years after* the occurrence giving rise to the right of rescission, or upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the act.

12 C.F.R. § 226.15(a) (emphases added).

Some official commentary from the Federal Reserve Board is also useful.[6] Regarding a "consumer," the commentary provides:

> 2(a)(11) Consumer.
>
> 1. Scope. Guarantors, endorsers, and sureties are not generally consumers for purposes of the regulation, but they may be entitled to rescind under certain circumstances and they may have certain rights if they are obligated on credit card plans.
>
> 2. Rescission rules. For purposes of rescission under §§ 226.15 and 226.23, a consumer includes *any natural person whose ownership interest in his or her principal dwelling is subject to the risk of loss.* Thus, *if a security interest is*

---

**6.** The regulations (and TILA itself) provide that the commentary by the Federal Reserve Board is persuasive authority:

> 1. Official status. This commentary is the vehicle by which the staff of the Division of Consumer and Community Affairs of the Federal Reserve Board issues official staff interpretations of Regulation Z, as revised effective April 1, 1981.

12 C.F.R. Pt. 226, Supp. I, at 368 (2007).

*taken in A's ownership interest in a house and that house is A's principal dwelling, A is a consumer for purposes of rescission,* even if A is not liable, either primarily or secondarily, on the underlying consumer credit transaction. An ownership interest does not include, for example, leaseholds or inchoate rights, such as dower.

3. Land trusts. *Credit extended to land trusts, as described in the commentary to § 226.3(a), is considered to be extended to a natural person for purposes of the definition of consumer.*

12 C.F.R. Pt. 226, Supp. I, at 372 (2007) (emphases added).

The commentary later provides:

7. Organizational credit. *The exemption for transactions in which the borrower is not a natural person applies,* for example, to loans to corporations, partnerships, associations, churches, unions, and fraternal organizations. The exemption applies regardless of the purpose of the credit extension and regardless of the fact that a natural person may guarantee or provide security for the credit.

8. Land trusts. *Credit extended for consumer purposes to a land trust is considered to be credit extended to a natural person* rather than credit extended to an organization. In some jurisdictions, a financial institution financing a residential real estate transaction for an individual uses a land trust mechanism. Title to the property is conveyed to the land trust for which the financial institution itself is trustee. The underlying installment note is executed by the financial institution in its capacity as trustee and payment is secured by a trust deed, reflecting title in the financial institution as trustee. In some instances, the consumer executes a personal guaranty of the indebtedness.

The note provides that it is payable only out of the property specifically described in the trust deed and that the trustee has no personal liability on the note. Assuming the transactions are for personal, family, or household purposes, these transactions are subject to the regulation since in substance (if not form) consumer credit is being extended.

*Id.* at 381 (emphases added).

Applying the language of these regulatory provisions, and considering TILA's purpose and statutory scheme as a whole, the Court concludes that Beth S. Amonette—a "natural person"—is a "consumer whose ownership interest is or will be subject to the security interest" under 12 C.F.R. § 226.15(a) and therefore "shall have the right to rescind" if the applicable TILA disclosure provisions are violated. That is, for purposes of rescission under TILA, she is a "natural person in whose principal dwelling a security interest is or will be retained or acquired" and her "ownership interest in the dwelling is or will be subject to the security interest." 12 C.F.R. § 226.2(a)(11). This interpretation takes into account the reality of the transaction as a whole and the purpose of TILA. *See Bloom v. I.C. System, Inc.,* 972 F.2d 1067, 1068 (9th Cir.1992) ("When classifying a loan [under the Consumer Credit Protection Act, of which TILA is a part], courts typically 'examine the transaction as a whole,' paying particular attention to 'the purpose for which [the] credit was extended in order to determine whether the transaction was primarily consumer or commercial in nature.' ") (quoting *Tower v. Moss,* 625 F.2d 1161, 1166 (5th Cir.1980)) (second brackets in original).

This interpretation is also supported by reasoning by the California Court of Appeals when facing a similar issue. In *Weber v. Langholz,* 39 Cal.App.4th 1578, 46

Cal.Rptr.2d 677 (1995), the California Court of Appeals, when addressing whether TILA applied to a transaction with a revocable living trust—while recognizing the particular language of TILA—observed as follows:

> [I]t seems unlikely Congress had this type of trust [revocable living trust] in mind when it defined consumer credit transactions as involving natural persons and excluded trusts. In *Fisch, Spiegler, Ginsburg & Ladner v. Appel,* [10 Cal. App.4th 1810, 13 Cal.Rptr.2d 471, 473 (Cal.Ct.App.1992)], the court held the settlors of a revocable living trust had a reversionary interest in the subject property which was sufficient to claim a homestead exemption, which can be claimed only by natural persons. *It appears the current regulations under the Act take a similar view that "natural person" includes persons whose ownership interest in their dwelling will be subject to a security interest.* (12 C.F.R. § 226.2(a)(11).)

*Weber,* 46 Cal.Rptr.2d at 680 (emphasis added). Ultimately, *Weber* did not decide the issue because it found, alternatively, that TILA did not apply in any event because the transaction was indisputably for investment/business purposes and not for consumer purposes. *Id.* at 681. That the reasoning was in dicta, however, does not diminish its persuasiveness here.

As noted in *Weber,* courts have concluded that a person does not lose the protection of "homestead" statutes (which generally exempt principal dwellings from certain creditors)—despite indications limiting provisions to "natural persons"—merely because a person's principal dwelling is held in a revocable living trust. *See Fisch, Spiegler,* 13 Cal.Rptr.2d at 473; *see also Engelke v. Estate of Engelke,* 921 So.2d 693, 696 (Fla.Dist.Ct.App.2006) ("while Paul's residence was held in a revocable trust, it was owned by a 'natural person' for purposes of the constitutional homestead exemption.").

■ These cases rely on the particular nature of a revocable living (or "intervivos") trust as a modern method of estate planning to hold property. Because a settlor of a revocable living trust retains an unlimited right to revoke any conveyance to the revocable living trust, it has an unfettered ownership interest even though title is legally held by the trust. *See id.* ("Because Paul retained a right of revocation, he was free to revoke the trust at any point in time. Accordingly, he maintained an ownership interest in his residence, even though a revocable trust held *title* to the property.") (emphasis in original). "A revocable trust is a unique type of transfer.... [W]hen a settlor sets up a revocable trust, he or she has the right to recall or end the trust at any time, and thereby regain absolute ownership of the trust property. This retention of control over property distinguishes a revocable trust from the other types of conveyances[.]" *Florida Nat'l Bank of Palm Beach County v. Genova,* 460 So.2d 895, 897 (Fla.1985).

The cases recognize that "revocable living trusts enjoy extensive use [and] serve many estate planning functions related to taxation and other matters." *Fisch, Spiegler,* 13 Cal.Rptr.2d at 473. They are "widely used will-substitute devices that provide flexibility in managing the settlor's assets during his or her lifetime." *Engelke,* 921 So.2d at 697. "[A] revocable living trust with the settlor as trustee has become a common device for people to manage their own assets during lifetime, avoid having to establish a conservatorship in the event of incapacity, and avoid probate upon death." *Weber,* 46 Cal.Rptr.2d at 680. "Living trusts are popular estate planning devices. Technically speaking, they are not 'estates' in themselves, but

devices to manage an 'estate.'" *In re Marriage of Perry,* 58 Cal.App.4th 1104, 68 Cal.Rptr.2d 445, 447 (1997) (citations omitted).

Accordingly, as both settlor, trustee, and beneficial owner—at least for present purposes—Amonette "effectively owned the property." *United States v. Stolle,* No. CV 99–00823, 2000 WL 1202087, at *5 (C.D.Cal. Feb. 14, 2000) (citations omitted). Her ownership interest entitles her to TILA's protections.[7]

Moreover, the purpose of the TILA exemption for organizations in 15 U.S.C. § 1603 is clearly to exempt businesses and "organizations" such as "loans to corporations, partnerships, associations, churches, unions, and fraternal organizations." 12 C.F.R. Pt. 226, Supp. I, at 381 (2007). It makes sense that loans to businesses or corporations (presumably more sophisticated entities) would not require all of TILA's protections. But there is no business or corporate-type credit at issue with Amonette's refinancing transaction. It is a coincidence that she had set up a revocable living trust for herself. These organizations ("corporations, partnerships, associations, churches, unions, and fraternal organizations") share no common characteristics with Amonette's personal revocable living trust. In contrast, the use of the terms "trust" or "estate" in section 1603 would fit entities such as the Estate of Bernice Pauahi Bishop, Rockefeller's Standard Oil Trust, or the J. Paul Getty Trust. The use of a revocable living trust was not common when Congress first defined "or-

ganization" for TILA in 1967. *See* H.R.Rep. No. 90–1040 (Dec. 13, 1967), reprinted in, 1968 U.S.C.C.A.N. 1962, 1981 (original definition of "organization" in Pub.L. No. 90–321); John J. Barnosky, *The Incredible Revocable Living Trust,* 10 J. Suffolk Acad. L. 1 (1995) (describing growing popularity of the revocable living trust as a will substitute).

Although a revocable living trust is legally a "trust," not all nominal "trusts" are "organizations" under TILA. For example, the Federal Reserve Board has specifically exempted "land trusts" from the definition of an "organization." As set forth earlier, Regulation Z provides that "[c]redit extended to land trusts, as described in the commentary to § 226.3(a), is considered to be extended to a natural person for purposes of the definition of consumer." 12 C.F.R. Pt. 226, Supp. I, at 372. In turn, the commentary to section 226.3(a) states

> Credit extended for consumer purposes to a land trust is considered to be credit extended to a natural person rather than credit extended to an organization. In some jurisdictions, a financial institution financing a residential real estate transaction for an individual uses a land trust mechanism. Title to the property is conveyed to the land trust for which the financial institution itself is trustee. The underlying installment note is executed by the financial institution in its capacity as trustee and payment is secured by a trust deed, reflecting title in the financial institution as trustee. In some instances, the consumer executes a

---

**7.** This ownership interest distinguishes this case from *In re Crevier,* which Defendant cites as persuasive. In *In re Crevier,* the Ninth Circuit found that debtors had no right to a TILA claim where the subject property—which they used as their principal dwelling—belonged to the bankruptcy estate and was controlled by a trustee. 820 F.2d at 1556 & n. 3. The Ninth Circuit reasoned that a con-

sumer's right to rescind required an ownership interest and "upon the Property's passing to the control of the estate, the [debtors] were divested of ownership rights in the property and had no right to transfer a security interest in it." *Id.* at 1556. In contrast, Amonette's ownership interest in her revocable living trust, as the Court has set forth, is real—at least for purposes of TILA.

personal guaranty of the indebtedness. The note provides that it is payable only out of the property specifically described in the trust deed and that the trustee has no personal liability on the note. *Assuming the transactions are for personal, family, or household purposes, these transactions are subject to the regulation since in substance (if not form) consumer credit is being extended.*

*Id.* at 381 (emphasis added).

While a revocable living trust does not fit within the description of a "land trust" in the commentary, Regulation Z's specific exclusion of a "land trust" from an "organization" (or inclusion within the definition of a "natural person") demonstrates that not all "trusts" are necessarily "organizations" within the meaning of TILA.

■ In this regard, IndyMac argues that regulations of an administrative agency cannot contradict the statute upon which the agency's authority is created. The Federal Reserve Board's interpretations and regulations, however, are given particularly persuasive significance in this area because Congress gave the Board specific authority to interpret TILA's exemptions. In particular, 15 U.S.C. § 1603(5) exempts "[t]ransactions for which the Board, by rule, determines that coverage under this subchapter is not necessary to carry out the purposes of [TILA]." Similarly, section 1604 gives the Board wide authority to implement TILA's exemption provisions. *See* 15 U.S.C. § 1604(a) (". . . these regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of [TILA]."); *see also* 15 U.S.C. § 1604(f)(1) ("The Board may exempt, by regulation, from all or part of [TILA] any class of transactions, . . . for

which, in the determination of the Board, coverage under all or part of [TILA] does not provide meaningful benefit to consumers in the form of useful information or protection.") As the Eighth Circuit has observed,

> [d]eference to the views of the Board is "especially appropriate" in the process of interpreting the TILA, given the agency's "pivotal role in setting the statutory machinery in motion," broad administrative lawmaking power delegated by Congress, and unique position to navigate the complexities of the statute[.]

*Hess v. Citibank (South Dakota), N.A.,* 459 F.3d 837, 842 (8th Cir.2006) (quoting *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566–69, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980)).

The Court thus relies upon Regulation Z to the extent its interpretations are not "irrational." As one court has reasoned:

> Regulation Z's requirements are significant because the permissible construction and interpretation of a statute promulgated by an agency charged with the statute's enforcement must be granted deference by the courts. This is especially true in the context of the TILA and Regulation Z, where even official staff interpretations of the statute and regulation should control unless shown to be irrational.

*In re Stanley,* 315 B.R. 602, 608 (Bankr. D.Kan.2004) (citing *Milhollin,* 444 U.S. at 559–70, 100 S.Ct. 790). The inclusion of a "land trust" as a "natural person" as set forth is not irrational. Likewise, the provisions are not irrational which indicate that TILA covers a person—such as Amonette here—whose ownership interest in her personal dwelling will be subject to a loan's security interest. They are not only rational, but set forth the quintessential Congressional purpose underlying TILA.

## IV.

For the foregoing reasons, Plaintiff Beth S. Amonette, individually and as trustee of the Beth Snodgrass Amonette Revocable Living Trust, has standing to make a claim for alleged violations of TILA. Merely because her ownership interest is in her living trust does not disqualify her from TILA's protections. Defendant IndyMac Bank's Motion to Dismiss, or in the Alternative, for Summary Judgment is DENIED.

IT IS SO ORDERED.