# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**THOMAS G. BURROUGHS**
**RONALD G. SENTMAN**
Katz & Korin, PC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
PETER C. KESLING:

**GEORGE T. PATTON, JR.**
Bose McKinney & Evans LLP
Indianapolis, Indiana

**BRENT E. INABNIT**
**KEVIN E. WARREN**
Sopko, Nussbaum, Inabnit & Kaczmarek
South Bend, Indiana

ATTORNEYS FOR APPELLEES
CHRISTOPHER K. KESLING, ADAM
KESLING AND EMILY KESLING:

**ROBERT W. WRIGHT**
Dean-Webster Wright LLP
Indianapolis, Indiana

**SHAW R. FRIEDMAN**
Friedman & Associates, P.C.
LaPorte, Indiana

**CARMEN M. PIASECKI**
**THOMAS H. SINGER**
Nickle & Piasecki
South Bend, Indiana

FILED
May 02 2012, 9:11 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ANDREW C. KESLING, individually and as Trustee of the Andrew C. Kesling Trust, | ) ) ) | |
| Appellant, | ) ) | |
| vs. | ) ) | No. 45A03-1106-PL-271 |
| PETER C. KESLING, et al., | ) ) ) | |
| Appellees. | ) | |

**May 2, 2012**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

In this interlocutory appeal, Andrew C. Kesling, individually and as Trustee of the Andrew C. Kesling Trust Dated March 28, 2001 (the "Trust"), appeals the judgment of June 23, 2011 (the "Judgment") in favor of his father, Peter Kesling.[1] Andrew raises two issues which we consolidate and restate as whether the court abused its discretion in concluding that Peter was entitled to rescission of agreements entered into on June 25, 2004. We reverse and remand.

The relevant facts follow. In 1955, Harold Kesling, who was Peter's father, along with Peter and Peter's brother David Kesling, founded TP Orthodontics, Inc. ("TPO"),

---

[1] This lawsuit was initiated on January 10, 2008, by Christopher, Adam, and Emily Kesling (the "Siblings"), siblings of Andrew, naming Andrew, the Trust, Peter, and TP Orthodontics, Inc. ("TPO") (a closely held corporation owned by the family and discussed below) as defendants, in which they asserted that they were each entitled to purchase certain shares of TPO stock. On February 29, 2008, Peter, as part of his answer to the Siblings' complaint, asserted a cross-claim against Andrew which is the subject of this appeal. Andrew's answer also asserted a cross-claim against Peter which the court in its Judgment denied as moot, and on which Andrew makes argument in his appellate briefs. Further, TPO asserted claims against Peter which the court severed prior to the 2010 trial. This appeal was timely filed under Ind. Appellate Rule 14(A) as a matter of right.

Also, in its Judgment the court denied the Siblings' request for relief as moot because "[a]ll of the stock at issue is being returned to Peter" pursuant to rescission. Appellant's Appendix at 41. In their complaint, the Siblings alleged five counts: Count I, breach of fiduciary duty; Count II, tortious breach of duty of good faith and fair dealing; Count III, actual fraud; Count IV, constructive fraud; and Count V, breach of contract.

which is in the business of developing, marketing, and selling orthodontic devices.[2] TPO is a closely held corporation and is organized under Subchapter S of the Internal Revenue Code. At TPO's incorporation, Peter was made the president of the board. Harold's wishes were that TPO would remain a family business.

The corporate by-laws, adopted in 1956, set forth the method for transferring stock in TPO:

> (1) By delivery of the certificate endorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby; or

> (2) By delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign, or transfer the same or the shares represented thereby, signed by the person appearing by the certificate to be the owner of the shares represented thereby. Such assignment or power of attorney may be either in blank or to a specified person.

Exhibit 1 at 26.

In 1973, the TPO shareholders entered into an agreement which restricted a shareholder's ability to transfer shares of TPO to a non-shareholder, noting that "the parties desire by mutual agreement to protect the small business corporation classification from destruction due to the transfer of shares to persons not now shareholders." Exhibit 3 at 1. On July 8, 1993, this agreement was amended and restated (the "Shareholder Agreement"), noting that "all of its shareholders, hereinafter collectively referred to as 'Shareholders', WITNESSETH:" and reiterating at the outset that "the parties desire by mutual agreement to protect the small business corporation qualification by restricting the

---

[2] Harold, Peter, and David made up the initial board of directors of TPO. However, TPO was a joint venture of the Kesling family and the Rocke family, including Doctor Robert Rocke.

3

transfer of shares to persons not now shareholders" and that "there are now voting and non-voting shares of [TPO] having the same rights and privileges, except voting rights." Exhibit 4 at 1. The Shareholder Agreement stated the following:

> 1. Any present Shareholder shall not be limited in the transfer of any of his or her voting or non-voting [TPO] shares to other existing Shareholders of [TPO].

> 2. Each and all of the Shareholders hereby gives to [TPO] the first right to purchase for cash, or on such terms as may be agreeable to the parties, any voting and/or non-voting shares hereafter offered for transfer to a person not at the time of transfer then Shareholders of [TPO]. This first right to purchase shall cover both voluntary and transfers by operation of law. The said first right to purchase shall exist for a period of ninety (90) days from the date of written notice by a Shareholder to [TPO] of an offer to sell or from the date that any certificates are tendered to [TPO] for transfer to a new Shareholder, whichever is the earlier. Beginning on the ninety-first (91st) day . . . the existing Shareholders of [TPO] shall have the right to purchase all of the offered shares as a group, or as individuals. This right to purchase in the Shareholders shall extend for ninety (90) days . . . .

> \* \* \* \* \*

> 6. Where a transfer is to occur because of the death of a Shareholder, the first purchase right of the Corporation shall expire at the close of the ninety-first (91st) day (a) after the death of a Shareholder, or (b) after appointment of a Personal Representative of his estate, whichever event is later in time. Death of a Shareholder shall not create a right of purchase in the Corporation where the voting and/or non-voting shares of a deceased Shareholder are bequeathed or distributed by the estate to persons who are existing Shareholders of the Corporation or the gift is to one or more individuals who qualifies under IRS regulations as a Sub-Chapter S eligible shareholder and who will agree in writing to be bound by this Agreement, or any agreement amendatory hereto as a replacement numerically for the deceased Shareholder.

> 7. Upon failure of the Corporation and individual Shareholders to exercise their rights to purchase within the time limits granted hereunder, the shares offered for transfer and the shares transferred by Will or by intestate succession shall be reissued to the new transferees subject to the terms and restrictions of this Agreement.

4

8.     All existing outstanding voting and non-voting shares shall be endorsed to show that their transfer is subject to the provisions of this Agreement.

*****

12.     This Agreement shall be binding on the parties and their respective heirs, Personal Representatives, successors and assigns. . . .

Exhibit 4A at 1-5.

On September 24, 1999, a special meeting of the Board of Directors was held in which Peter, Andrew, and David were present and in which Peter held a voting proxy for Christopher Kesling; the minutes of the meeting noted that "[a] majority of the directors were present for the transaction of business." Exhibit 5A. At the meeting, a variety of topics were addressed including "a proposed resolution governing requests to transfer shares into the name of a revocable trust." Id. The following resolution (the "1999 Resolution") was unanimously adopted:

> "WHEREAS, David L. Kesling and Sharon F. Kesling have requested transfer of their shares of [TPO] stock into certain revocable trusts;
>
> WHEREAS, it is likely that other shareholders will also desire to also transfer shares into revocable trusts;
>
> WHEREAS, the Corporation has a stock purchase Agreement dated July 8, 1993, which restricts transfer of the shares to persons who are not presently shareholders of the Corporation; and
>
> WHEREAS, it is in the best interests of the Corporation to develop a policy for handling such requests for transfer of shares to a revocable trust.
>
> NOW, THEREFORE, BE IT AND IT IS HEREBY RESOLVED that:
>
> 1.     The Corporation shall accept requests for transfer of shares into a revocable trust, provided that each of the terms set forth in this resolution have been performed.

5

2. Any shareholder requesting transfer of his or her shares into a trust must deliver a copy of the first and last (or signature) pages of the Trust, together with a copy of all dispositive provisions of the Trust, to establish that the income of the trust will be paid solely to a shareholder and that, upon the death of the shareholder, the Trust will distribute the shares to the estate of the shareholder, subject to any stock purchase Agreement in effect at that time. Presently, the stock purchase Agreement gives the Corporation the first right to purchase all or part of the shares prior to any distribution to a new shareholder. The Trust shall also contain no provisions which would disqualify the Corporation as a Small Business Corporation under Sub-Chapter S of the Internal Revenue Code.

3. The shareholder shall enter into an agreement in writing with the Corporation to the effect that the shareholder (a) will not alter or change the dispositive provisions of the Trust without the approval of the Corporation and (b) acknowledges that the Corporation shall not transfer on the transfer books of the Corporation the shares held in trust to any person in violation of the stock purchase Agreement then in effect.

Id. The minutes from the meeting also noted that Peter was stepping down as Chairman of the Board of Directors but that he would continue as a member of the board. The minutes were signed by Andrew, as President, and Peter, as Chairman.

In 2001, prior to the annual shareholder meeting,[3] Andrew contacted Attorney Daniel Lewis, who was TPO's assistant secretary and had served as TPO's attorney for

---

[3] The minutes of the annual shareholder meeting held on May 26, 2001, stated:

The following shareholders were present in person:

| | |
|---|---|
| Doctor Peter C. Kesling | 5,898 voting shares |
| Doctor David L. Kesling | 1,121 voting shares |
| Doctor Christopher K. Kesling | 441 voting shares |
| Andrew C. Kesling | 540 voting shares |
| Sharon F. Kesling | 801 voting shares |
| Daniel E. Lewis, Jr., Personal Representative of the Estate Of R. Thomas Rocke | 265 voting shares |

A total of 9,066 shares were represented in person or 74.98% of the 12,090 voting shares

many years, as well as personal attorney for both Peter and Andrew, about estate planning advice. On March 28, 2001, Andrew formed the Andrew C. Kesling Trust Dated March 28, 2001 (the "Trust"), by executing a Declaration of Revocable Living Trust (the "Trust Declaration"). The Trust Declaration states at the top: "I, ANDREW C. KESLING . . . declare that by this instrument I am creating the Andrew C. Kesling Trust. Initially, I shall act as Trustee. By acceptance of this instrument, I and any Successor Trustee agree to administer the trust according to the terms of this instrument." Exhibit 7 at 1. The Trust Declaration names "Andrew C. Kesling" as grantor as well as trustee during his life, and he signed the document as both grantor and trustee. Id. Section 1.02, which defines "Trustee," also notes that Andrew's wife, Dorothy R. Kesling, was to act as trustee upon Andrew's death or if he should become incapacitated or resign, and that upon Dorothy's resignation or incapacity, James W. Kaminski was to act as trustee. Id. The Trust Declaration also named a "Trust Committee" for appointing successor trustees, as well as removing a current trustee after Andrew's death, which was comprised of Peter, Daniel Lewis, and James Kaminski. Id. at 1-2. Also, as grantor, Andrew reserved under Article Eight "the right to amend, modify, or revoke this Agreement, in whole or in part, at any time or times, by notice in writing delivered to the Trustee . . . effective immediately upon actual delivery to the Trustee." Id. at 25.

issued and outstanding. Andrew C. Kesling declared that there was a quorum of shareholders present for the transaction of business.

Exhibit 6A.

7

Section 2.01, entitled "Funding," states that "I hereby transfer to the trust estate the property listed in Exhibit 'A' attached hereto," and Exhibit A listed, among other things, Andrew's shares of TPO voting and non-voting stock (540 and 3,488 shares, respectively). Id. at 2, 34. Also, Section 2.03, entitled "Distributions," stated the following:

> The Trustee shall distribute to or for my benefit and/or the benefit of my wife, Dorothy R. Kesling, all of the net income and so much of the principal as I shall direct in writing. In the event of my incapacity, the Trustee may distribute to or for the benefit of Dorothy R. Kesling so much of the net income and principal as the Trustee shall determine in its sole discretion to be necessary or appropriate for the health, maintenance and support of either of us. . . .

Id. at 2-3.

Article Three, which governs disposition of the Trust's property upon Andrew's death, directs that the assets be allocated into a marital fund, in which a separate trust would be formed for the benefit of Dorothy, and a family fund for distribution to Andrew's four children and their descendants. Section 3.08 is entitled "Family Disaster" and states that "[i]n the event [Dorothy] fails to survive my death, and in the further event there are no descendants of mine surviving my death, then the Trustee shall distribute the trust estate as follows," and further states that Andrew's TPO shares "shall be sold to that corporation in accordance with the terms of the Shareholders Agreement then in effect." Id. at 8. Also, Article Five listed the powers of the trustee and included, under Section 5.01(e), the power:

> To vote any corporate stock, either in person or by proxy, with or without power of substitution, except that if the possession of this power as to any security would adversely affect the issuing company or the Trustee's ability to retain or vote such security, the Trustee shall vote such security as

8

directed by the income beneficiary or beneficiaries of the trust in which the security is held.

Id. at 14. Finally, Paragraph 8.01 denoted the power reserved by the grantor and stated: "I reserve, during my lifetime, the right to amend, modify or revoke this Agreement, in whole or in part, at any time or times, by notice in writing to the Trustee, and such amendment, modification or revocation shall be effective immediately upon actual delivery to the Trustee." Id. at 25.

In February 2004, at a time in which Andrew was serving as the CEO of TPO and Doug Biege was serving as President, tension developed between Andrew and Peter regarding Andrew interfering with Biege's duties as President, and Peter made a decision to remove Andrew from TPO's day-to-day operations. After a conversation between Peter and Andrew, however, Peter decided not to remove Andrew. However, in May 2004, tension between Peter and Andrew resurfaced, and Andrew told Peter that Peter had "three choices. . . . [Andrew] said, I can buy you out; you can buy me out; or we can sell the company." Transcript at 503. Soon after, Andrew became "really shocked" when Peter told him that he decided to sell Andrew "enough [voting stock] to give [Andrew] 51 percent." Id. at 503-504. Peter made this decision because Andrew "had been running the Company for 20 years or so" and was "definitely the better businessman" of Peter's children. Id. at 1065.

Peter informed TPO's Board of his intention to sell a majority interest in TPO to Andrew, and on May 15, 2004, the Board "noted and approved . . . the sale of 5,410

9

shares of voting stock by Peter C. Kesling to Andrew C. Kesling."[4]  Exhibit 5E.  On May

18, 2004, Peter sent a letter to the law office of Newby, Lewis, Kaminski & Jones

("NLKJ") requesting that Daniel Lewis prepare documents to effect the sale of 5,410

shares of Peter's voting stock to Andrew.  Peter attached to the letter an outline of the

agreement noting that he would sell Andrew 5,293 shares at $144.71 and 117 shares,

which would "carry [Andrew] beyond 50 percent of the voting shares," at $241.18.

Appellant's Appendix at 576.  The outline, signed by Peter, states: "I agree to the sale of

my shares of [TPO] Voting stock to Andrew C. Kesling as set forth above."  Id. at 577.

As part of the agreed-upon transaction between Andrew and Peter, Andrew agreed to pay

one-half of Lewis's legal fee, and Lewis represented both Andrew and Peter.

On May 21, 2004, Lewis sent a letter to Andrew with enclosed drafts of the two

agreements to purchase stock, and on May 24, 2004, Lewis sent the same to Peter.  The

drafts listed "PETER C. KESLING" as Seller and "ANDREW C. KESLING" as Buyer,

stated that "[s]ince Buyer is an existing shareholder of [TPO], this sale and transfer of

---

[4] We note that the minutes from the annual shareholder meeting held the same day indicate that, at that time, there were eleven shareholders of TPO, and each shareholder was listed with the corresponding amount of voting and non-voting shares as follows:

| | |
|---|---|
| Peter C. Kesling | 16,670 |
| Timothy J. Kesling | 7,049 |
| David L. Kesling, Trustee | 4,526 |
| Andrew C. Kesling | 4,028 |
| Christopher K. Kesling | 3,632 |
| Adam W. Kesling | 3,483 |
| Emily A. Kesling | 3,483 |
| Sharon F. Kesling, Trustee | 3,234 |
| Douglas L. Biege | 1,265 |
| R. Thomas Rocke Exemption Equivalent Trust | 1,152 |
| Charlene J. Kesling | 50 |

Exhibit 6B.

shares is permitted under the terms" of the Shareholder's Agreement, and noted that "[s]o long as Buyer is not in default in making the payments . . . the Buyer shall be entitled to all rights to vote the shares deposited with the Escrow Agent," which was NLKJ. Exhibit 11.

Soon after, Andrew expressed concern to Lewis about what would happen with his TPO shares "if something happened to him," and on June 16, 2004, Lewis sent Andrew a letter with enclosures consisting of amended purchase agreements and a draft of a Voting Trust Agreement (the "Voting Trust"). The Voting Trust stated that it was an agreement "between ANDREW C. KESLING ("Shareholder"), and ANDREW C. KESLING ("[Voting] Trustee")" and that at its execution, "Shareholder shall assign and deliver all stock certificates representing shares of voting stock of [TPO] to the [Voting] Trustee, who shall cause the shares represented thereby to be transferred to the [Voting] Trustee as voting trustee on the books of" TPO, and indicated that this included the shares he was purchasing from Peter. Exhibit 17 at Paragraph 1. The Voting Trust stated that the Voting Trustee or any successor "shall have the exclusive right to vote upon such shares" and noted that in the event of death or disability of the Voting Trustee, "Peter C. Kesling or Charlene J. Kesling, or their survivor, shall serve as first alternate successor Trustee(s)," and that Lewis was named as second alternate successor Trustee. Id. at Paragraphs 2, 5.

Also, language was added to the purchase agreements reading: "So long as Buyer is not in default in making the payments herein provided, the Buyer or any voting trustee designated by Buyer shall be entitled to all rights to vote the shares deposited with the

11

Escrow Agent." Exhibit 13 at Paragraph 5. Also, a new paragraph titled "Death of Buyer" was added to the draft purchase agreements which stated that "[i]n the event of the death of the Buyer . . . the shares are subject to purchase by [TPO] or its shareholders pursuant to the provisions of the Shareholder Agreement." Id. at Paragraph 7. Lewis included this paragraph "to remind everyone . . . what would happen," because under the Shareholder Agreement, if Andrew died, "he couldn't pass the shares onto his children. . . . Or his wife. . . . Because she was not a shareholder." Transcript at 953.

On June 21, 2004, Andrew and Lewis spoke by telephone and discussed making amendments to the Trust. Andrew "wanted to be more precise about what would happen to his shares" in the event of his death, and also wanted language in the purchase agreements allowing for an opportunity to cure in the event of default in making installment payments. Id. at 955. Based upon these concerns, Lewis made further changes to the purchase agreements in what would be the final drafts. Paragraph 7 was changed to read: "Death of Buyer. In the event of the death of the Buyer . . . the shares are subject to disposition as stated in the Declaration of Revocable Living Trust dated March 28, 2001, established by Buyer, as amended June 25, 2004." Exhibit 15A, B at Paragraph 7. Also, the default provisions were changed to provide Andrew a thirty-day grace period and to allow Andrew to keep any shares he had paid for in the event of default.

On June 25, 2004, Peter, his wife Charlene, Andrew, Lewis, and another attorney, James Kaminski, met at the NLKJ offices to finalize the sale of stock to Andrew. Andrew, individually, and Peter signed both purchase agreements as amended (the

12

"Stock Purchase Agreements"), and Lewis signed both agreements to accept his appointment as escrow agent.  Andrew's Voting Trust was also executed; Andrew signed as both Shareholder and Trustee of the Voting Trust, Peter and Charlene signed as the First Successor Trustees, Lewis signed as the Second Successor Trustee, and Kaminski signed as the Third Successor Trustee.  Overall, the meeting lasted thirty minutes or less.

Further, on that same day Andrew signed the First Amendment to Declaration of Revocable Living Trust (the "Trust Amendment"), in which Andrew's "[v]oting and non-voting shares of [TPO], together with any voting trust certificates representing voting shares of [TPO] held in voting trust" were allocated to the Marital Fund provided for in the Trust upon the death or incapacity of Andrew.  Exhibit 16 at Paragraph 3.04(a)(iii). Also, Paragraph 3.06 states the following:

> **Termination of Family Fund**  --  If my wife survives me, the Family Fund shall continue during the lifetime of my wife, Dorothy R. Kesling.  Upon her death, or upon my death if she does not survive me, the Trustee shall take the following actions:
>
> (a)     The Trustee shall offer to sell all voting and non-voting shares of [TPO], together with voting trust certificates . . . held in any voting trust at the price according to a formula contained in the then existing Shareholders Agreement among [TPO] to the following existing shareholders:
>
> (i)     To my father and mother, Peter C. Kesling and Charlene J. Kesling, or the survivor;
>
> (ii)     If my father and mother are not living, then to the then living members of a class consisting of my uncle, David L. Kesling, my brother, Christopher K. Kesling, my sister, Emily Kesling, and my brother Adam W. Kesling, in equal shares.

13

Id. at Paragraph 3.06. A similar provision for selling Andrew's TPO shares to his relatives was included in Paragraph 3.08 in the event of a Family Disaster. The Trust Amendment was signed by Andrew as Grantor, pursuant to the Grantor's power of amendment reserved in Paragraph 8.01 of the Trust.

After the Stock Purchase Agreements were signed, Peter endorsed his stock certificates, which included certificates 56, 61, and 70, and provided them to his assistant, Lori Allen, and Allen prepared the back of the certificates pursuant to instructions which she received and noted that the new stock certificates were issued to "Andrew C. Kesling Trust dated March 28, 2001." Exhibits 36A, 36B, 36C. Previously, Lewis had prepared a checklist regarding the steps necessary to prepare the stock certificates to complete the transfer. Peter signed each of the certificates. Three stock certificates were issued in the name of the Trust: Certificate 176 reflected ownership of the 117 shares Andrew purchased at the premium rate, Certificate 177 reflected ownership of the other 5,293 shares Andrew purchased from Peter, and Certificate 178 reflected the 540 shares Andrew owned prior to the purchase from Peter.[5]

On February 28, 2006, at the TPO Board of Directors meeting, Peter expressed concern regarding royalty payments paid to Andrew "for the '859 patent invented by Andrew Kesling as well as payments from Kesling & Rocke for rent and no charge product supplied to the Kesling and Rocke clinic." Exhibit 5I. Then, at the September

---

[5] Prior to this time, the stock certificates in Andrew's possession for the 540 shares were in the name of Andrew C. Kesling.

Also, at some point Certificates 176-178 were lost, and on January 9, 2008, Andrew executed an affidavit to obtain a replacement stock certificate. In the affidavit, Andrew stated that he "is the Trustee of the Andrew C. Kesling Trust dated March 28, 2001 and is the true, lawful, present and sole owner" of the stock, and he signed the affidavit as the Trustee of the Trust. Exhibit 28.

26, 2006 board meeting, the directors adopted a resolution forming an investigating committee to determine whether TPO "has a legal or equitable right or remedy to recover funds improperly paid by [TPO] to Andrew" and whether "it is in the best interest of [TPO] to pursue that right or remedy," and delineating the specificities of the task. Exhibit 5J. In November 2006, based on this investigation, Peter filed a complaint against Andrew which was removed to federal court. On November 19, 2007, Andrew filed a reply brief in support of his summary judgment motion which contained the following footnote:

> Counsel recently learned that the stock purchased by Andrew was apparently transferred by Peter directly to the [Trust]. Because a revocable trust is a separate legal entity under Indiana law, *Walz v. Walz*, 423 N.E.2d 729, 732 (Ind. Ct. App. 1981); *In re Canaday*, 2007 WL 2694337, *10 (Bkr. N.D. Ind. Sept. 12, 2007), the transfer renders Peter's claims subject to dismissal under Trial Rule 12(b)(6) because the stock is no longer owned by Andrew and there is no evidence of any misrepresentations or omissions by Andrew, as trustee of the Trust in connection with the stock transfer as the Trust was not a party to the Stock Purchase Agreements.

Exhibit 45 at 1 n.2.[6]

---

[6] We note that Peter argues in his brief that Andrew is judicially estopped from asserting that he was a shareholder on June 25, 2004 because he asserted the opposite position in his reply brief in the federal lawsuit. Andrew responds in his reply brief that judicial estoppel does not apply because "Peter failed to demonstrate that Andrew gained some litigation advantage by presenting the argument in another case." Appellant's Reply Brief at 7. Andrew notes that "Peter's Brief failed to explain how the cited language in a federal summary judgment brief permitted Andrew to gain an advantage" and "a reading of the federal court's decision denying Peter's summary judgment motion finds no reference to the language of Andrew's counsel . . . and the federal judge expressly relied on Peter's version of the facts, not Andrew's." Id. (parentheses omitted).

Indeed, for judicial estoppel to apply, "[t]here must have been a determination of the prior action, or, at least, the allegations or admission must have been acted on by the court in which the pleadings were filed or by the parties claiming the estoppel." Alaska Seaboard Partners Ltd. P'ship v. Hood, 949 N.E.2d 1247, 1254 (Ind. Ct. App. 2011). We note that Peter does not direct us to, and our review of the record does not reveal, that the federal court decision makes reference to this assertion by Andrew in his reply brief in that litigation.

On January 10, 2008, siblings of Andrew, Christopher, Adam, and Emily Kesling (the "Siblings"), filed a complaint naming Andrew, the Trust, Peter, and TPO as defendants, and requested that an "order be entered declaring that [they] are entitled to purchase the 5,950 voting shares of TPO stock pursuant to the terms of the Shareholder Agreement . . . ." Appellant's Appendix at 50. In their complaint, the Siblings stated that, as a result of Peter's lawsuit in federal court, they were made aware that the 5,410 shares of stock sold to Andrew were not transferred to Andrew but rather to the Trust, that "[t]he Trust was not an existing shareholder of TPO at the time the TPO shares were transferred into it," that this was a violation of the Shareholder Agreement, and that therefore they were entitled to purchase the shares. Id. at 46. On February 29, 2008, Peter, as part of his answer to the Siblings' complaint, asserted a cross-claim against Andrew requesting that the court rescind Stock Purchase Agreements executed on June 25, 2004 and return the stock to Peter because "Peter would not have entered into the 2004 Transaction, giving Andrew voting control of the Company, had he known that Andrew had caused the Company to pay himself substantial royalties to which he was not entitled." Id. at 74. On September 5, 2008, Peter moved for leave to amend his answer and cross-claim, stating that, based upon discovery provided by Andrew on July 17, 2008, Peter "learned that Andrew Kesling was not a shareholder of [TPO] in June, 2004. The discovery of this new fact is important because it forms an additional basis for Peter's actual and constructive fraud claims . . . ." Id. at 265.

On July 12, 2010, the court commenced a five-day bench trial in which evidence consistent with the foregoing was presented. At trial, Peter testified that, at the meeting

on June 25, 2004, the only changes highlighted by Lewis between the first drafts and final copies of the purchase agreements were regarding the inclusion of the Voting Trust and the changes to the default provisions. Peter also testified that he believed Andrew was a shareholder on that date. Peter testified that he did not discuss the preparation of the stock certificates with Allen or otherwise instruct her with regard to their preparation. Peter testified that he did not read the stock certificates before signing them because he "was just asked to sign, not to read," and he "trust[ed] the people that prepared" them. Transcript at 1095. Peter testified that the only trust of Andrew's he knew about in 2004 was the Voting Trust. Allen testified similarly that she did not discuss the certificate preparation with Peter, although she also testified that she did not remember who gave her instructions to list the Trust as the transferee. Andrew testified that on June 25, 2004, he believed that he owned his original shares individually and not in trust.

On August 20, 2010, Andrew, Peter, the Siblings, and TPO each filed a post-trial brief. On June 23, 2011, the court issued its Judgment and, after reciting the basic facts of the case, stated as follows:

> 4. For many years prior to the filing of this lawsuit, Andrew Kesling ("Andrew") along with his siblings, the Plaintiffs in this case, owned shares of TPO stock. On March 28, 2001, Andrew transferred all of his then existing TPO shares to his Revocable Trust ("Trust"). Andrew's transfer to the Trust is reflected in paragraph 2.01 of the Trust. Andrew's transfer to the Trust was in accord with the transfer provisions of TPO's By-Laws, which provide that transfer of TPO shares may be accomplished by delivery of the certificate and completion of a separate written assignment signed by the owner of the shares. The Trust contained the necessary assignment and signature. Delivery of the certificate was accomplished because Andrew was both the owner of the shares and the settlor of the Trust. *Hind[s] v. McNair*, 129 N.E.2d 553, 565 (Ind. 1955). Under Indiana law, the transfer from Andrew to the Trust occurred upon

17

execution of the Trust. *In the Matter of Walz*, 423 N.E.2d 729, 732 (Ind. Ct. App. 1981).

5. Accordingly, from March 28, 2001 through June 25, 2004, Andrew, individually, was not a TPO shareholder. Rather, during this period the Trust was the owner of what had previously been Andrew's shares of TPO stock.

6. On June 25, 2004, Peter and Andrew entered into two agreements wherein Peter sold 5,410 shares of TPO voting stock to Andrew. The transaction was premised upon the fact that Andrew was an existing shareholder of TPO.

7. Andrew's status as an existing shareholder was material to the transaction.

8. On January 10, 2008, Plaintiffs, Christopher Kesling, Adam Kesling, and Emily Kesling, initiated this lawsuit and asserted that they were each entitled to purchase certain shares of TPO stock based upon events that transpired after June 25, 2004.

9. Plaintiffs' request for relief is **DENIED**. All of the stock at issue is being returned to Peter. Therefore, Plaintiffs' claims are moot.

10. The Court is persuaded by the greater weight of the evidence that Andrew knew he transferred all of his TPO shares to the Trust on March 28, 2001 and failed to disclose that fact to Peter at the time he entered into his agreement to purchase the stock referred to in Paragraph 6.

11. At a minimum, the evidence established that there was a mutual mistake of a material fact between Peter and Andrew regarding Andrew's status as a shareholder on June 25, 2004.

12. Based upon the foregoing, the Court determines that Peter is entitled to rescission of the June 25, 2004 agreements.

\* \* \* \* \*

16. Based upon the Court's rescission of the June 25, 2004 agreements, and in order to restore the parties to the position they were in prior to June 25, 2004, the Court **ORDERS** the parties to forthwith develop a plan to implement this Judgment to include:

18

A. Peter shall return to Andrew all payments Peter has received from Andrew toward the purchase of the 5,410 voting shares.

B. TPO shall cancel any and all stock certificates which were associated in any manner with the June 25, 2004 agreements.

C. TPO shall issue a new stock certificate to Peter which reflects that Peter owns the 5,410 voting shares.

D. Payment to Peter of the dividends Andrew received since June 25, 2004 as a result of Andrew's purported ownership of the 5,410 voting shares.

17. Pursuant to the foregoing, Judgment is hereby entered in favor of Peter and against Plaintiffs, Andrew, and TPO.

Appellant's Appendix at 40-42 (citations omitted).

The issue is whether the court abused its discretion in concluding that Peter was entitled to rescission of the Stock Purchase Agreements. Where, as here, the trial court enters findings and conclusions *sua sponte*, we apply the standard of review set out in Trial Rule 52. Chidester v. City of Hobart, 631 N.E.2d 908, 909 (Ind. 1994). "We determine whether the evidence supports the findings and the findings support the judgment." Bowyer v. Ind. Dep't of Natural Res., 944 N.E.2d 972, 983 (Ind. Ct. App. 2011) (quoting Garling v. Ind. Dep't of Natural Res., 766 N.E.2d 409, 410 (Ind. Ct. App. 2002) (quoting Chidester, 631 N.E.2d at 910), trans. denied), reh'g denied. "In deference to the trial court's proximity to the issues, 'we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment.'" Id. (quoting Garling, 766 N.E.2d at 410) (quoting Oil Supply Co. v. Hires Parts Serv., Inc., 726 N.E.2d 246, 248 (Ind.2000))). "We do not reweigh the evidence, but only consider the evidence favorable to the trial court's judgment." Id.

19

While we review findings of fact under the clearly erroneous standard, we review *de novo* a trial court's conclusions of law. Id.; Fobar v. Vonderahe, 771 N.E.2d 57, 59 (Ind. 2002). "Where cases present mixed issues of fact and law, we have described the review as applying an abuse of discretion standard." Bowyer, 944 N.E.2d at 983; Fraley v. Minger, 829 N.E.2d 476, 482 (Ind. 2005). We will conclude a judgment is clearly erroneous if no evidence supports the findings, the findings fail to support the judgment, or if the trial court applies the incorrect legal standard. Bowyer, 944 N.E.2d at 983-984. "In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made." Id.; Yanoff v. Muncy, 688 N.E.2d 1259, 1262 (Ind. 1997). However, *sua sponte* findings control only as to the issues they cover and a general judgment will control as to the issues upon which there are no findings. Tracy v. Morell, 948 N.E.2d 855, 862 (Ind. Ct. App. 2011). A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence. Id.

As chronicled above, the crux of the trial court's Judgment is that: (A) Andrew, due to his Trust Declaration in 2001, was not a shareholder of TPO on June 25, 2004; and (B) as such, Peter is entitled to rescission of the Stock Purchase Agreements due to a mutual mistake of fact in Peter and Andrew's understanding of Andrew's shareholder status.

Before addressing the issues presented, however, we note that the doctrine of mutual mistake provides that "[w]here both parties share a common assumption about a vital fact upon which they based their bargain, and that assumption is false, the

20

transaction may be avoided if because of the mistake a quite different exchange of values occurs from the exchange of values contemplated by the parties." Perfect v. McAndrew, 798 N.E.2d 470, 478 (Ind. Ct. App. 2003) (quoting Bowling v. Poole, 756 N.E.2d 983, 988-989 (Ind. Ct. App. 2001) (quoting Wilkin v. 1st Source Bank, 548 N.E.2d 170, 172 (Ind. Ct. App. 1990))). "It is not enough that both parties are mistaken about any fact; rather, the mistaken fact complained of must be one that is 'of the essence of the agreement, the *sine qua non*, or, as is sometimes said, the efficient cause of the agreement, and must be such that it animates and controls the conduct of the parties.'" Id. (quoting Bowling, 756 N.E.2d at 989 (quoting Jackson v. Blanchard, 601 N.E.2d 411, 416 (Ind. Ct. App. 1992))). Where a mutual mistake of fact is present, the equitable doctrine of rescission may apply. Tracy, 948 N.E.2d at 866; see also Poppe v. Jabaay, 804 N.E.2d 789, 796 (Ind. Ct. App. 2004) (noting that rescission of a contract may be available in cases of "fraud, illegality, or mutual mistake"), trans. denied, cert. denied, 543 U.S. 1164, 125 S. Ct. 1333 (2005); Franklin v. White, 493 N.E.2d 161 (Ind. 1986) (holding rescission of contract proper after determination of mutual mistake of fact).

A.      Shareholder Status

We begin by addressing Andrew's shareholder status on June 25, 2004, the date the Stock Purchase Agreements were executed. First, to the extent that we must interpret the Trust, we note that the interpretation of a trust is a question of law for the court. Paloutzian v. Taggart, 931 N.E.2d 921, 925 (Ind. Ct. App. 2010) (citing Univ. of S. Ind. Found. v. Baker, 843 N.E.2d 528, 531 (Ind. 2006)). The primary purpose of the court in construing a trust instrument is to ascertain and give effect to the settlor's intention and

21

carry out this intention unless it is in violation of some positive rule of law or against public policy. Id. (citing Baker, 843 N.E.2d at 532; Malachowski v. Bank One, Indianapolis, 590 N.E.2d 559, 565 (Ind. 1992); Walz, 423 N.E.2d at 733). This court is not "at liberty to rewrite the trust agreement any more than it is at liberty to rewrite contracts." Id. (quoting Malachowski, 590 N.E.2d at 565-66). When a trust instrument must be construed by a court, we attempt to discern the settlor's intent in light of the facts and circumstances existing at the time the instrument was executed. Id. (citing Malachowski, 590 N.E.2d at 566).

Also, we note that this court has stated:

> When property is delivered over to a trustee, whether by virtue of a trust agreement or a testamentary devise, the trustee takes the legal title to the property and the cestui trust or beneficiary takes the equitable title. Both have a property interest recognized by law. Where the trust provides that the trustee shall hold and manage the property and pay the income derived therefrom and a part of all of the corpus in its discretion to one beneficiary for life and the remainder, if any, to a remainder beneficiary upon the death of the first beneficiary, both the first beneficiary and the remainder beneficiary, upon the activation of the trust, acquire an interest and one that can be assigned by either beneficiary.

Breeze v. Breeze, 428 N.E.2d 286, 287-288 (Ind. Ct. App. 1981) (quoting In re Trusteeship of Creech v. Russellville Bank, 130 Ind. App. 611, 619, 159 N.E.2d 291, 295 (1959)). Further, we note that "'[i]f the owner of property declares himself trustee of the property, a trust may be created without a transfer of title to the property.'" Hinds v. McNair, 235 Ind. 34, 52, 129 N.E.2d 553, 563-564 (1955) (quoting 1 Restatement, Trusts, § 17, cmt. a (1935); 1 Scott, Trusts, § 17.1).[7]

---

[7] We note that Section 17 of the Restatement (Second) of Trusts states in relevant part:

Although the question of whether the settlor, who places shares of stock into a revocable inter vivos trust and names himself as trustee and as a beneficiary, retains his shareholder status has not been examined in Indiana case law, the Indiana Supreme Court has examined an instance in which an individual asserted property rights where the property was held in a revocable trust. In Marshall Cnty. Tax Awareness Comm. v. Quivey, remonstrater David Good collected 129 signatures on six remonstrance petitions and "signed the verification form as a carrier of the petitions" as an individual rather than as the trustee of a revocable living trust in which his interest in his home was held.[8] 780 N.E.2d 380, 383 (Ind. 2002), reh'g denied. Based upon Good's signing the petitions as an individual, the Auditor determined that his "signature as a carrier was invalid" and "invalidated all 129 of the signatures Good collected." Id. The trial court ruled that the Auditor "properly excluded the signatures Good collected because of his failure to show ownership status by omitting his designation as trustee." Id.

On appeal, the Court observed that "[t]here seems to be no question that Good is the beneficial owner of real property located in the school corporation, and as trustee is also a record owner" and that the property was "located within the relevant school district." Id. at 385. The Court held: "We think it was clear enough who Good was and

---

A trust may be created by

    (a)    a declaration by the owner of property that he holds it as trustee for another person; or

    (b)    a transfer inter vivos by the owner of property to another person as trustee for the transferor or for a third person; or . . . .

[8] Good and his wife were "the settlors, trustees, and beneficiaries of the trust." Marshall Cnty., 780 N.E.2d at 383.

that, as trustee of a revocable trust created by himself and his wife, he was an owner of property within the district." Id. In so holding, the Court also discussed Ind. Code § 6-1.1-20-3.2, which governs the verifications of petitions and remonstrances and noted that the "statute does not permit County Auditors to add their own requirements for the verification procedure." Id. See also Oken v. Hammer, 791 P.2d 9, 10-13 (Colo. App. 1990) (holding that deed conveying property was valid despite the fact that seller executed the deed of trust as "Rosann H. Stegall, a single person" rather than signing as trustee of her living trust, in which the property was held).

Assuming that Andrew's Trust Declaration in 2001 had the effect of placing Andrew's shares into the Trust,[9] the question becomes whether, under the circumstances of this case, Andrew's placement of his TPO voting stock into a revocable trust rendered him a non-shareholder vis a vis the Shareholder Agreement. The parties disagree about the legal status of a revocable trust in Indiana. Andrew cites to the first section in the Indiana Trust Code, which defines a "trust" as "a fiduciary relationship between a person who, as trustee, holds title to property and another person for whom, as beneficiary, the title is held." Ind. Code § 30-4-1-1(a). Andrew also notes that the Indiana Supreme Court, in a decision from 1958 discussing a receivership, stated that "[a]n estate, a receivership, a trusteeship are not parties to the judgment in the lower court because they are not legal entities. A trust is represented by the fiduciary, who is the party to the judgment." Baugher v. Hall, 238 Ind. 170, 171-172, 147 N.E.2d 591, 592 (1958). Peter cites other Indiana case law stating:

---

[9] Of course, if the Trust Declaration did *not* have such an effect, then a controversy regarding Andrew's shareholder status on June 25, 2004, would not exist.

24

The inter vivos trust is a unique legal entity. Through its use, the settlor may transfer property to a trustee reserving for the life of the settlor the beneficial use of the property with the remainder to designated beneficiaries. Although the settlor enjoys the beneficial use of the trust property until his death that trust property is not subject to the administration of his estate. Leazenby v. Clinton County Bank & Trust Co. (1976), 171 Ind. App. 243, 355 N.E.2d 861. That is, the trust property is not in the decedent-settlor's estate. The Probate Code, which controls the distribution of decedent's property, does not control the inter vivos distributions of property.

In Smyth v. Cleveland Trust Co. (1961), 172 Ohio St. 489, 179 N.E.2d 60, the surviving wife challenged the validity of her husband's creation of an inter vivos trust. The Ohio Supreme Court explained the distinction between the inter vivos distribution and the testamentary distribution:

> []Where, as here, a settlor transfers, assigns and sets over to a trustee title to property owned by him in proceeding to create a trust inter vivos, the interest therein passes immediately to the trustee, and the trust is consummated even though the trust instrument reserves to the settlor the income for life, an absolute power to revoke the trust in whole or in part and the right to control investments and further to modify the trust in any respect. Where the remainder over at his death is to be held for the benefit of his wife for life and later to be distributed to his heirs . . . , there is created, at the instant of creation of the trust, a vested equitable interest in the remaindermen subject to defeasance in whole or in part by the exercise of the power to revoke or modify. . . .

In re Walz, 423 N.E.2d 729, 732 (Ind. Ct. App. 1981); see also In re Weitzman, 724 N.E.2d 1120, 1123 (Ind. Ct. App. 2000) (citing Walz with approval). Thus, Walz states that an inter vivos, revocable trust is a tool for estate planning and describes it as both "unique" and a "legal entity." Accordingly, Peter argues that the court did not abuse its discretion when it "concluded based upon the fact that Andrew had transferred all of his TPO shares to his Revocable Trust that 'Andrew, individually, was not a TPO shareholder.'" Appellee's Brief at 37 (quoting Appellant's Appendix at 41).

The evolution of the treatment of trusts in the law is highlighted by the Restatements of Trusts. The Second Restatement states the following in its introductory note:

> A trust is one of several juridical devices whereby one person is enabled to deal with property for the benefit of another person. Among other such devices are bailment, guardianship, and agency. These latter devices are to be found in all mature systems of law; the trust is a peculiar product of the Anglo-American system. The principles, rules, and standards of the law of Trusts owe their origin and development in large part to the circumstance that in England there were for centuries separate courts of common law and chancery, to which is due the distinction between legal interests and equitable interests which is the basis of the law of Trusts.
>
> * * * * *
>
> In a trust there is a separation of interests in the subject matter of the trust, the beneficiary having an equitable interest and the trustee having an interest which is normally a legal interest. Thus the creation of a trust is a method of disposing of property. The creation of a trust includes also, however, the creating of a personal relation involving the rights and duties between the beneficiary and the trustee. In the origin of trusts and of uses out of which the modern trust has developed, the emphasis was laid out on the personal relation; but in the course of time the emphasis has shifted and is now laid on the aspect of a trust as a disposition of property. . . .

RESTATEMENT (SECOND) OF TRUSTS intro. note (1959).

The Third Restatement contains the following introductory note to Chapter 21, titled "Liability of Trust or Trustee to Third Party:"

> This Chapter states now-prevalent doctrine in the United States reflecting common-law and statutory concepts as they have evolved since the Second Restatement of Trusts. Id. § 268, Comment a, succinctly stated the traditional approach to trustee liability to third parties:
>
>> [A] person to whom the trustee has incurred a liability in the administration of the trust . . . could obtain a judgment against the trustee personally and obtain satisfaction out of the trustee's individual property, and the trustee could then obtain

26

reimbursement from the trust estate, provided that the liability was properly incurred by the trustee and that he had committed no breach of trust.

Under this traditional approach . . . a trustee is personally liable on any contract made by the trustee, even if the trustee acted properly. . . . A trustee is entitled to indemnification from the trust estate if the trustee acted properly.

Commentators have long criticized the traditional approach as unfair to trustees . . . . Reacting to these concerns, most American states no longer follow the traditional rules. Under the modern approach adopted in this chapter, third parties may proceed against a trustee in the trustee's fiduciary ("representative") capacity whether or not the trustee is also personally liable, with the trustee shielded from personal liability insofar as the trustee acted properly.

The approach in §§ 105 and 106 recognizes modern reality rather than traditional concepts. *Technically, the trust is still not generally recognized as a legal "entity," but it is generally for federal tax purposes, and in practice trustees act on behalf of their trusts and are sued as trust representatives. Indeed, in this Chapter and elsewhere in this country, the trust is* treated *as an entity to such an extent that it is no longer inappropriate to refer to claims against or liabilities of a "trust" (as in the title and content of this Chapter) and to the liability or debt of a beneficiary to a "trust" (as in Chapter 20), or to refer to and treat trusts, in law and in practice, as if they were entities in numerous other contexts.*

RESTATEMENT (THIRD) OF TRUSTS ch. 21, intro. note (2007) (emphasis added) (parentheses omitted).

Thus, as indicated by the most recent Restatement of Trusts (and indeed as the arguments of the parties demonstrate), the legal status of a trust is an evolving concept.[10]

---

[10] We note that a recent uniform law dealing with statutory trusts (also known as business trusts) states that "[i]n large part because of uncertainty over the legal status of the business trust at common law, use of the common-law trust as a mode of business organization declined over the course of the twentieth century." UNIFORM STATUTORY TRUST ENTITY ACT prefatory note (2011). Because of this uncertainty, "at least thirty states have enacted legislation that validates the trust as a permissible form of business organization." Id. The Uniform Act notes:

A statutory trust differs from a common-law trust in important respects. A common-law

27

Regarding Indiana specifically, we note that there are instances in Indiana case law in which a revocable trust itself has been listed as a party to a lawsuit, rather than listing the trustee acting on behalf of the trust as the party. See, e.g., Breeden Revocable Trust v. Hoffmeister-Repp, 941 N.E.2d 1045 (Ind. Ct. App. 2010); Barkwill v. The Cornelia H. Barkwill Revocable Trust, 902 N.E.2d 836 (Ind. Ct. App. 2009), trans. denied. However, regardless of the legal position occupied by a revocable trust in Indiana, we think it a different question whether, under the circumstances of this case, Andrew's Trust Declaration establishing a revocable trust in which he is the settlor, trustee, and a beneficiary, constituted a transfer to a non-shareholder under TPO's by-laws and the Shareholder Agreement and extinguished his "ownership" over those assets, and thus whether Andrew ceased to be a Shareholder of TPO after March 28, 2001.

Andrew argues that "the Trust or trustee did not become an 'owner' merely by taking legal title" because "[t]he Trust Code makes clear that a trustee is not an 'owner.'" Appellant's Brief at 21 (citing Ind. Code § 30-4-3-15). Andrew argues that "the primary

---

trust, whether its purpose is donative or commercial, arises from private action without the involvement of a public official. Because a common-law trust is not a juridical entity, it must sue and be sued, own property, and transact in the name of the trustee and in the trustee's capacity as such. . . . A statutory trust is formed by the filing of a certificate of trust by a public official, typically the Secretary of State, in the public record.

Id. Section 302 of the Uniform Act, titled, "Statutory Trust as Entity," states: "A statutory trust is an entity separate from its trustees and beneficial owners."

We also note that the Uniform Act defines "common-law trust" as

[A] fiduciary relationship with respect to property arising from a manifestation of intent to create that relationship and subjecting the person that holds title to the property to duties to deal with the property for the benefit of charity or for one or more persons, at least one of which is not the sole trustee, whether the purpose of the trust is donative or commercial. . . .

Id. at § 102(3).

28

indicia of ownership are title, possession, and control," and that because "as grantor, Andrew reserved the power to amend, modify or revoke the Trust Declaration and [] remove the Trustee with or without cause," "the trustee lacked sufficient control over the Trust and its estate to indicate that the trustee had become the owner of Andrew's Pre-2004 Shares." Id. at 22-23. As support for his position, Andrew directs our attention to instances in the law in which the settlor is assigned an ownership interest over assets held in trust.

First, Andrew points to the Internal Revenue Code, which provides that "[t]he grantor shall be treated as the owner of any portion of a trust . . . where at any time the power to revest in the grantor title to such portion is exercisable by the grantor . . . ." Id. at 26 (quoting 26 U.S.C. § 676). Second, Andrew argues that "the ability of creditors to obtain payment from the assets of a grantor trust for debts of the grantor, but not those of the trustee, further demonstrates that the grantor owns the trust assets, not the trustee." Id. at 27. Andrew draws our attention to the Indiana Trust Code, which "provides that 'if the settlor is also a beneficiary of the trust, a provision restraining the voluntary or involuntary transfer of his beneficial interest will not prevent his creditors from satisfying the claims from his interest in the trust estate,'" Id. (quoting Ind. Code § 30-4-3-2(b)), and that by "contrast, creditors of a trustee (instead of the grantor) may not recover the trustee's debt from the trust assets." Id. at 28 (citing Ind. Code § 30-4-4-3(a)). Third, Andrew points to case law from other jurisdictions. Id. at 28-29 (citing Amonette v. IndyMac Bank, 515 F. Supp. 2d 1176, 1184 (D. Haw. 2007) (holding that "[b]ecause a settlor of a revocable living trust retains an unlimited right to revoke any conveyance to

the revocable living trust, it has an unfettered ownership interest even though title is legally held by the trust" and that the settlor could pursue a Truth in Lending Act claim); Engelke v. Estate of Engelke, 921 So.2d 693, 696 (Fla. Dist. Ct. App. 2006) (holding that "[b]ecause [grantor] retained a right of revocation, he was free to revoke the trust at any point in time. Accordingly, he maintained an ownership interest in his residence, even though a revocable trust held *title* to the property" and thus the grantor was entitled to homestead protections)).

Peter argues that "[t]he possibility that a grantor of a trust may be accountable for federal tax purposes does not address whether the grantor was individually divested of ownership of the shares upon creation of a valid trust," noting that such a "circumstance is analogous to the tax treatment of a limited liability company," in which "there is no dispute that when a limited liability company elects to pass its tax liability through to its members, it remains a separate entity notwithstanding the election." Appellee's Brief at 50. Peter argues that Andrew's arguments regarding creditors' rights are not applicable to this matter because "Andrew is not the sole beneficiary of the Revocable Trust." Id. at 51. Peter also distinguishes the cases cited by Andrew on factual grounds.[11]

Under the circumstances, in which Andrew in 2001 formed a revocable trust, naming himself as trustee and beneficiary for life, and in his Trust Declaration assigned

---

[11] Peter also argues that Andrew waived these arguments "because they were never raised before the trial court." Appellee's Brief at 49. Andrew responds to this suggestion in his reply brief by citing to Indiana Supreme Court precedent which states that although "substantive questions independent in character and not within the issues or not presented to the trial court shall not be first made upon appeal," that "does not mean that no new position may be taken, or that new arguments may not be adduced" regarding the issues properly presented. Appellant's Reply Brief at 11 (quoting Wagner v. Yates, 912 N.E.2d 805, 811 n.1 (Ind. 2009)). Here, whether Andrew owned the TPO shares was before the trial court.

his shares of TPO to the Trust, we find that Andrew was a Shareholder of TPO on June 25, 2004, when he entered into the Stock Purchase Agreements with Peter. As in Marshall Cnty., there is no question that Andrew is the beneficial and record owner of the shares of TPO, and indeed the Trust under Section 5.01(e) makes clear that Andrew is entitled to vote the shares. In so holding, we are mindful of the fact that, as constructed, the assets held in the Trust are reachable by Andrew's potential creditors. Ind. Code § 30-4-3-2(b) (". . . if the settlor is also a beneficiary of the trust, a provision restraining the voluntary or involuntary transfer of his beneficial interest will not prevent his creditors from satisfying claims from his interest in the trust estate."); see also Fitton v. Bank of Little Rock, 2010 Ark. 280, at 3-4, 7-8 (holding that wife is entitled to homestead exemption in instance where the property is held by her revocable trust in which wife was the settlor, trustee and one of the beneficiaries of the trust), reh'g denied; Mickam v. Joseph Louis Palace Trust, 849 F. Supp. 516, 523 (E.D. Mich. 1993) ("[T]he Trust was a revocable trust. Under Michigan law, a revocable trust is not a separate legal entity with regard to the rights of creditors.") (construing Michigan statute which assigns ownership of assets held in revocable trust to the grantor regarding creditor's rights) (citing United States v. Peelle, 159 F. Supp. 45, 56 (E.D.N.Y. 1958) (construing similar New York statute)), reconsideration granted in part.

We are also persuaded by Andrew's arguments pertaining to the Internal Revenue Code, which assigns ownership of assets under such circumstances to the grantor. In addition to the arguments advanced by Andrew, as one commentator has observed, the IRS has repeatedly "ruled that the trust and the settlor are a single entity, thus making a

sale or bona fide debt obligation between them impossible." Howard M. Zaritsky, *Revocable Inter Vivos Trusts*, 860 Tax Management Portfolio (BNA), A-57 (2003) (citing Rev. Rul. 85-13, 1985-1 C.B. 184).

Further, the blurring of the lines between a settlor of a revocable trust and the assets held in trust regarding ownership in tax law is illustrated by examining the reasoning found in W & W Fertilizer Corp. v. U.S., 527 F.2d 621 (Ct. Cl. 1975), cert. denied, 425 U.S. 974, 96 S. Ct. 2173 (1976), and subsequent legislative action. In W & W Fertilizer, at issue was whether a corporation became ineligible for S Corporation status after the taxpayer transferred his shares into a revocable inter vivos trust. 527 F.2d at 622, 627. On appeal, the taxpayer argued that "it would be inconsistent not to consider him the owner of the shares for Subchapter S eligibility purposes and yet tax him as their 'owner' on the income they produce." Id. at 627. The court held that although "the 'grantor trust rules' of section 671 et seq." are concerned "with actual command over the property taxed," "[s]ubchapter S was enacted as a remedial measure to relieve qualifying small business corporations of a tax otherwise payable" and "[s]ection 1371(a)(2) limits the benefits of the Act to corporations whose stock is owned solely by individuals or estates" and thus "[w]here such a deliberately specific qualification is imposed, we must strictly apply it lest the narrow benefit intended by Congress be unduly broadened." Id. at 627-628.

However, W & W Fertilizer was decided prior to the Subchapter S Revision Act of 1982, Pub. L. No. 97-354, 96 Stat. 1669 (1982), which added § 1361 redefining an S

Corporation. § 2, 96 Stat. 1669 (1982).  As currently constituted, I.R.C. § 1361(b)(1)

defines an S Corporation as:

> a domestic corporation which is not an ineligible corporation and which does not—
>
> (A)    have more than 100 shareholders,
>
> (B)    have as a shareholder a person (other than an estate, a trust described in subsection (c)(2), or an organization described in subsection (c)(6)) who is not an individual,
>
> (C)    have a nonresident alien as a shareholder, and
>
> (D)    have more than 1 class of stock.

I.R.C. § 1361(c)(2)(A) permits certain trusts to be included as shareholders of an S

Corporation, including "[a] trust all of which is treated (under subpart E of part I of

subchapter J of this chapter) *as owned by an individual* who is a citizen or resident of the

United States," which includes Andrew's Trust.   I.R.C. §§ 676, 1361(c)(2)(A)(i)

(emphasis added).

Thus, Congress amended the Internal Revenue Code and expanded upon the

Code's view that settlors with the ability to control the assets of their revocable trusts

possess an ownership interest.[12]  This conclusion is bolstered by <u>Wilson v. C. I. R.</u>, which

---

[12] We note that the other sections in subchapter J, part I, subpart E of chapter 1 of the Internal Revenue Code which assign trust ownership to the grantor are similar to the power to revoke in that they vest a certain level of control over the trust corpus or income to the grantor.  <u>See</u> I.R.C. § 673 ("The grantor shall be treated as the owner of any portion of a trust in which he has a reversionary interest in either the corpus or the income therefrom . . . ."); I.R.C. § 674 ("The grantor shall be treated as the owner of any portion of a trust in respect of which the beneficial enjoyment of the corpus or the income therefrom is subject to a power of disposition, exercisable by the grantor . . . ."); I.R.C. § 675 (noting that "[t]he grantor shall be treated as the owner of any portion of a trust" in which the grantor possesses certain administrative powers, including: (1) the power to deal for less than adequate and full consideration; (2) the power to borrow without adequate interest or security; (3) the power to borrow the trust funds; and (4) general powers of administration); I.R.C. § 677 (noting that the grantor shall be treated as the owner of any portion of a trust in which the trust income is used for the benefit of the

held that the beneficial owners of corporate stock, which are also those "who bear[] those tax consequences," determine whether to "consent to the subchapter S election." 560 F.2d 687, 689 (5th Cir. 1977). Thus, because Andrew is responsible for the taxes of his TPO stock, he is the person who provides consent to TPO operating as an S Corporation.

We turn next to the relevant TPO corporate documents and apply these principles. First, we note that, under the corporate by-laws, two alternative methods for transferring TPO stock were established, both of which required "delivery of the certificate" and either an endorsement to the recipient or a separate document assigning the certificate or a power of attorney. In either case, it is undisputed that Andrew did not "deliver" his stock certificates for transfer prior to June 25, 2004; rather, to the extent that Andrew placed his shares in the Trust, such placement was effected merely by the execution of his Trust Declaration. As noted above, "'[i]f the owner of property declares himself trustee of the property, a trust may be created without a transfer of title to the property.'" Hinds, 235 Ind. at 52, 129 N.E.2d at 563-564; see also Taliaferro v. Taliaferro, 921 P.2d 803, 810 (Kan. 1996) ("So also, the owner of property can create a trust by executing an instrument conveying the property to himself as trustee. In such a case there is not in fact

---

grantor). Conversely, I.R.C. § 678 states that:

> A person other than the grantor shall be treated as the owner of any portion of a trust with respect to which:
>
> (1)    such person has a power exercisable solely by himself to vest the corpus or the income therefrom in himself, or
>
> (2)    such person has previously partially released or otherwise modified such a power and after the release or modification retains such control as would, within the principles of sections 671 to 677, inclusive, subject a grantor of a trust to treatment as the owner thereof.

a transfer of legal title to the property, since he already has legal title to it, but the instrument is as effective as if he had declared himself trustee.") (quoting RESTATEMENT (SECOND) OF TRUSTS § 17 cmt. a (1959)).

Second, the Shareholder Agreement restricting a shareholder's ability to transfer shares of TPO to a non-shareholder stated that its purpose was "to protect the small business corporation qualification by restricting the transfer of shares to persons not now shareholders." Exhibit 4 at 1. The Shareholder Agreement established that while there would not be limits imposed on transferring shares to existing shareholders, if a shareholder desired to sell shares the shareholder would first have to give TPO the right to purchase and subsequently give the other shareholders the same right. However, Andrew's Trust Declaration for estate planning purposes did not deprive Andrew of control of his property, and he continues to be responsible for the taxes thereon and his creditors can reach the shares. At any point, Andrew can revoke the Trust, in which case there would be no debate about where ownership lies. Finally, to the extent that Indiana law provides that the equitable interest in property held in trust is vested in the trust beneficiaries, we note that Andrew is the named beneficiary for life. Thus, we conclude that Andrew's Trust Declaration did not deprive him of his status as a shareholder of TPO.[13] See Fla. Nat'l Bank of Palm Beach Cnty. v. Genova, 460 So.2d 895, 897 (Fla. 1985) ("A revocable trust is a unique type of transfer. . . . [W]hen a settlor sets up a

_____

[13] To the extent that Peter suggests that "the 1999 Resolution makes absolutely clear that a transfer to a trust is a transfer to a non-shareholder," Appellee's Brief at 49, we note that the 1999 Resolution recognized that shareholders could establish revocable trusts and set forth a mechanism giving the company oversight over the trust to ensure that the trusts established would be in compliance with the Shareholder Agreement.

35

revocable trust, he or she has the right to recall or end the trust at any time, and thereby regain absolute ownership of the trust property. This retention of control over property distinguishes a revocable trust from the other types of conveyances."); In re Marriage of Perry, 68 Cal. Rptr. 2d 445, 447 (Cal. Ct. App. 1997) ("Living trusts are popular estate planning devices. Technically speaking, they are not 'estates' in themselves, but devices to manage an 'estate.'"); Cf. Empire Prop. v. Cnty. Of Los Angeles, 52 Cal. Rptr. 2d 69, 72 (Cal. Ct. App. 1996) (noting that, under the California Code of Regulations, although a "change in ownership" generally "occurs upon creation of the trust by the transfer of real property into the trust," there are several exceptions "including an exception for the transfer of real property into a *revocable* trust" and that a change in ownership does occur at the time the revocable trust becomes irrevocable "unless the trustor—transferor remains or becomes the sole present beneficiary").

B.      Rescission

Because we hold that Andrew's Trust Declaration did not extinguish his rights as a Shareholder of TPO, and therefore that he was a Shareholder on June 25, 2004, there is no mutual mistake of fact upon which to base an order of rescission in favor of Peter. Accordingly, we conclude that the court abused its discretion when it ordered the Stock Purchase Agreements to be rescinded and the shares returned to Peter.[14]

Having made these determinations, however, we note what this opinion does *not* address. The Siblings in their brief request that "if this Court determines that Peter is not

---

[14] We also note that the agreements signed by Peter and Andrew contain the "Death of Buyer" provision noted above which states: "In the event of the death of the Buyer . . . the shares are subject to disposition *as stated in the Declaration of Revocable Living Trust dated March 28, 2001, established by Buyer, as amended June 25, 2004.*" Exhibit 15A, B at Paragraph 7 (emphasis added).

entitled to rescind the June 25, 2004 agreements, then [the Siblings'] claims are no longer moot and the case should be remanded to the trial court for a determination" of their claims. Siblings' Brief at 6-7. As indicated above, this appeal is of an interlocutory nature and regards the court's ruling on Peter's claim for rescission; however, it was the Siblings who filed the original complaint in January 2008 alleging five counts: Count I, breach of fiduciary duty; Count II, tortious breach of duty of good faith and fair dealing; Count III, actual fraud; Count IV, constructive fraud; and Count V, breach of contract. The court in its Judgment found these claims to be moot in light of its judgment of rescission.

In his reply to the Siblings' brief, Andrew argues that they "are not entitled to ask the Court of Appeals to remand the case to the Trial Court" because "they failed either to appeal directly or to assert cross-appeal." Reply to Siblings' Brief at 1. Ind. Appellate Rule 9(D) provides in part that "[a]n appellee may cross-appeal without filing a Notice of Appeal by raising cross-appeal issues in the appellee's brief." In their brief, the Siblings repeatedly assert that if this court reverses the trial court's order of rescission, then we should remand for the court to rule on their claims. See Siblings' Brief at 1, 2, 6-7. Accordingly, we find this sufficient to preserve the issue on appeal, and we remand for the court to rule on the claims raised by Siblings.[15]

For the foregoing reasons, we reverse the court's Judgment and remand.

Reversed and remanded.

---

[15] Also, we note that our opinion today does not address whether Andrew's Trust Declaration and Trust Amendment violated the Shareholder Agreement or the 1999 Resolution, which is not before this court.

MAY, J., and CRONE, J., concur.