## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**
Apr 30 2015, 10:08 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS

Shaw R. Friedman
Friedman & Associates, P.C.
LaPorte, Indiana

Carmen M. Piasecki
Nickle & Piasecki
South Bend, Indiana

Geoffrey Slaughter
Taft Stettinius & Hollister LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
ANDREW C. KESLING,
INDIVIDUALLY AND AS TRUSTEE
OF THE ANDREW C. KESLING
TRUST DATED MARCH 28, 2001

Thomas G. Burroughs
Michael W. Hile
Katz & Korin, PC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE TP
ORTHODONTICS, INC.

Sean M. Clapp
Elizabeth M. Ellis
Clapp Ferrucci
Fishers, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Christopher K. Kesling, Emily Kesling, and Adam Kesling,

*Appellants-Plaintiffs,*

v.

Andrew C. Kesling, individually and as Trustee of the Andrew C. Kesling Trust Dated March 28,

April 30, 2015

Court of Appeals Case No.
45A03-1404-PL-135

Appeal from the Lake Superior Court
The Honorable John R. Pera, Special Judge
Trial Court Cause No. 45D10-0907-PL-94

2001, Peter Kesling, and TP
Orthodontics, Inc.,

*Appellees-Defendants*


**Bradford, Judge.**

# Case Summary[1]

Appellants-Plaintiffs Christopher Kesling, Emily Kesling, and Adam Kesling (collectively, the "Siblings") are shareholders in a family-owned business, Appellee-Defendant TP Orthodontics, Inc. ("TPO"). The Siblings' brother, Appellee-Defendant Andrew Kesling, and father, Appellee-Defendant Peter Kesling, are also shareholders in TPO.

The instant dispute arises from the transfer of certain shares of TPO from Peter to Andrew. Simply stated, the Siblings challenge the transfer, arguing that the transfer violated the terms of TPO's Shareholder Agreement, and that under the terms of the Shareholder Agreement, they should have received the right of first purchase of the shares in question. Finding that the transfer of the shares in question did not violate the terms of the Shareholder Agreement, the trial court

---

[1] We note that Appellants have filed a Motion for Oral Argument. Appellants' Motion for Oral Argument is denied in an order handed down simultaneously with this memorandum decision.

determined that the Siblings were not entitled to their requested relief. We agree and accordingly affirm the judgment of the trial court.

# Facts and Procedural History

[3] Initially we note that the instant appeal is the second time the parties have come before our court in relation to the underlying claims. Our prior opinion in this matter instructs us to the underlying relevant facts and procedural history: "In 1955, Harold Kesling, who was Peter's father, along with Peter and Peter's brother David Kesling, founded TPO, which is in the business of developing, marketing, and selling orthodontic devices." *Kesling v. Kesling*, 967 N.E.2d 66, 67 (Ind. Ct. App. 2012). "TPO is a closely held corporation and is organized under Subchapter S of the Internal Revenue Code." *Id*. "At TPO's incorporation, Peter was made the president of the board." *Id*. "Harold's wishes were that TPO would remain a family business." *Id*.

[4] The corporate by-laws, adopted in 1956, set forth the method for transferring stock in TPO:

> (1) By delivery of the certificate endorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby; or

> (2) By delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign, or transfer the same or the shares represented thereby, signed by the person appearing by the certificate to be the owner of the shares represented thereby. Such assignment or power of attorney may be either in blank or to a specified person.

Exhibit 1 at 26.

In 1973, the TPO shareholders entered into an agreement which restricted a shareholder's ability to transfer shares of TPO to a non-shareholder, noting that "the parties desire by mutual agreement to protect the small business corporation classification from destruction due to the transfer of shares to persons not now shareholders." Exhibit 3 at 1. On July 8, 1993, this agreement was amended and restated (the "Shareholder Agreement"), noting that "all of its shareholders, hereinafter collectively referred to as 'Shareholders', WITNESSETH:" and reiterating at the outset that "the parties desire by mutual agreement to protect the small business corporation qualification by restricting the transfer of shares to persons not now shareholders" and that "there are now voting and non-voting shares of [TPO] having the same rights and privileges, except voting rights." Exhibit 4 at 1. The Shareholder Agreement stated the following:

> 1. Any present Shareholder shall not be limited in the transfer of any of his or her voting or non-voting [TPO] shares to other existing Shareholders of [TPO].

> 2. Each and all of the Shareholders hereby gives to [TPO] the first right to purchase for cash, or on such terms as may be agreeable to the parties, any voting and/or non-voting shares hereafter offered for transfer to a person not at the time of transfer then Shareholders of [TPO]. This first right to purchase shall cover both voluntary and transfers by operation of law. The said first right to purchase shall exist for a period of ninety (90) days from the date of written notice by a Shareholder to [TPO] of an offer to sell or from the date that any certificates are tendered to [TPO] for transfer to a new Shareholder, whichever is the earlier. Beginning on the ninety-first (91st) day ... the existing Shareholders of [TPO] shall have the right to purchase all of the offered shares as a group, or as individuals. This right to purchase in the Shareholders shall extend for ninety (90) days....

> ****

On September 24, 1999, a special meeting of the Board of Directors was held [during which] ... a variety of topics were addressed including "a proposed resolution governing requests to transfer shares

into the name of a revocable trust." *Id*. The following resolution (the "1999 Resolution") was unanimously adopted:

> "WHEREAS, David L. Kesling and Sharon F. Kesling have requested transfer of their shares of [TPO] stock into certain revocable trusts;
>
> WHEREAS, it is likely that other shareholders will also desire to also transfer shares into revocable trusts;
>
> WHEREAS, the Corporation has a stock purchase Agreement dated July 8, 1993, which restricts transfer of the shares to persons who are not presently shareholders of the Corporation; and
>
> WHEREAS, it is in the best interests of the Corporation to develop a policy for handling such requests for transfer of shares to a revocable trust.

NOW, THEREFORE, BE IT AND IT IS HEREBY RESOLVED that:

> 1. The Corporation shall accept requests for transfer of shares into a revocable trust, provided that each of the terms set forth in this resolution have been performed.
>
> 2. Any shareholder requesting transfer of his or her shares into a trust must deliver a copy of the first and last (or signature) pages of the Trust, together with a copy of all dispositive provisions of the Trust, to establish that the income of the trust will be paid solely to a shareholder and that, upon the death of the shareholder, the Trust will distribute the shares to the estate of the shareholder, subject to any stock purchase Agreement in effect at that time. Presently, the stock purchase Agreement gives the Corporation the first right to purchase all or part of the shares prior to any distribution to a new shareholder. The Trust shall also contain no provisions which would disqualify the Corporation as a Small Business Corporation under Sub-Chapter S of the Internal Revenue Code.
>
> 3. The shareholder shall enter into an agreement in writing with the Corporation to the effect that the shareholder (a) will not alter or change the dispositive

> provisions of the Trust without the approval of the
> Corporation and (b) acknowledges that the Corporation
> shall not transfer on the transfer books of the Corporation
> the shares held in trust to any person in violation of the
> stock purchase Agreement then in effect.

*Id*. The minutes from the meeting also noted that Peter was stepping
down as Chairman of the Board of Directors but that he would
continue as a member of the board. The minutes were signed by
Andrew, as President, and Peter, as Chairman.

*Id.* at 68-70 (emphases in original).

[5]     Prior to the 2001 annual shareholder meeting, Andrew contacted his attorney about estate planning advice.[2] *Id*. at 70. "On March 28, 2001, Andrew formed the Andrew C. Kesling Trust Dated March 28, 2001 (the "Trust"), by executing a Declaration of Revocable Living Trust (the "Trust Declaration")." *Id*.

> The Trust Declaration states at the top: "I, ANDREW C. KESLING
> ... declare that by this instrument I am creating the Andrew C. Kesling
> Trust. Initially, I shall act as Trustee. By acceptance of this
> instrument, I and any Successor Trustee agree to administer the trust
> according to the terms of this instrument." Exhibit 7 at 1. The Trust
> Declaration names "Andrew C. Kesling" as grantor as well as trustee
> during his life, and he signed the document as both grantor and
> trustee. *Id*. Section 1.02, which defines "Trustee," also notes that
> Andrew's wife, Dorothy R. Kesling, was to act as trustee upon
> Andrew's death or if he should become incapacitated or resign, and
> that upon Dorothy's resignation or incapacity, James W. Kaminski
> was to act as trustee. *Id*. The Trust Declaration also named a "Trust
> Committee" for appointing successor trustees, as well as removing a
> current trustee after Andrew's death, which was comprised of Peter,
> Daniel Lewis, and James Kaminski. *Id*. at 1-2. Also, as grantor,

---

[2] Andrew's attorney was also TPO's assistance secretary, had served as TPO's attorney for many years, and was the personal attorney for both Peter and Andrew. *Id*. at 70.

Andrew reserved under Article Eight "the right to amend, modify, or revoke this Agreement, in whole or in part, at any time or times, by notice in writing delivered to the Trustee ... effective immediately upon actual delivery to the Trustee." *Id*. at 25.

Section 2.01, entitled "Funding," states that "I hereby transfer to the trust estate the property listed in Exhibit 'A' attached hereto," and Exhibit A listed, among other things, Andrew's shares of TPO voting and non-voting stock (540 and 3,488 shares, respectively). *Id*. at 2, 34. Also, Section 2.03, entitled "Distributions," stated the following:

> The Trustee shall distribute to or for my benefit and/or the benefit of my wife, Dorothy R. Kesling, all of the net income and so much of the principal as I shall direct in writing. In the event of my incapacity, the Trustee may distribute to or for the benefit of Dorothy R. Kesling so much of the net income and principal as the Trustee shall determine in its sole discretion to be necessary or appropriate for the health, maintenance and support of either of us....

*Id*. at 2-3.

Article Three, which governs disposition of the Trust's property upon Andrew's death, directs that the assets be allocated into a marital fund, in which a separate trust would be formed for the benefit of Dorothy, and a family fund for distribution to Andrew's four children and their descendants. Section 3.08 is entitled "Family Disaster" and states that "[i]n the event [Dorothy] fails to survive my death, and in the further event there are no descendants of mine surviving my death, then the Trustee shall distribute the trust estate as follows," and further states that Andrew's TPO shares "shall be sold to that corporation in accordance with the terms of the Shareholders Agreement then in effect." *Id*. at 8. Also, Article Five listed the powers of the trustee and included, under Section 5.01(e), the power:

> To vote any corporate stock, either in person or by proxy, with or without power of substitution, except that if the possession of this power as to any security would adversely affect the issuing company or the Trustee's ability to retain or vote such security, the Trustee shall vote such security as directed by the income beneficiary or beneficiaries of the trust in which the security is held.

*Id*. at 14. Finally, Paragraph 8.01 denoted the power reserved by the grantor and stated: "I reserve, during my lifetime, the right to amend, modify or revoke this Agreement, in whole or in part, at any time or times, by notice in writing to the Trustee, and such amendment, modification or revocation shall be effective immediately upon actual delivery to the Trustee." *Id*. at 25.

*Id*. at 70-71 (emphases in original).

"In February 2004, at a time in which Andrew was serving as the CEO of TPO and Doug Biege was serving as President, tension developed between Andrew and Peter regarding Andrew interfering with Biege's duties as President, and Peter made a decision to remove Andrew from TPO's day-to-day operations." *Id*. "After a conversation between Peter and Andrew, however, Peter decided not to remove Andrew." *Id*.

> However, in May 2004, tension between Peter and Andrew resurfaced, and Andrew told Peter that Peter had "three choices.... [Andrew] said, I can buy you out; you can buy me out; or we can sell the company." Transcript at 503. Soon after, Andrew became "really shocked" when Peter told him that he decided to sell Andrew "enough [voting stock] to give [Andrew] 51 percent." *Id*. at 503-504. Peter made this decision because Andrew "had been running the Company for 20 years or so" and was "definitely the better businessman" of Peter's children. *Id*. at 1065.

*Id*. at 71-72 (emphases in original). "Peter informed TPO's Board of his intention to sell a majority interest in TPO to Andrew, and on May 15, 2004, the Board noted and approved ... the sale of 5,410 shares of voting stock by Peter C. Kesling to Andrew C. Kesling." *Id*. at 72 (internal quotation omitted).

[7] "On May 18, 2004, Peter sent a letter to the law office of Newby, Lewis, Kaminski & Jones ("NLKJ") requesting that Daniel Lewis prepare documents to effect the sale of 5,410 shares of Peter's voting stock to Andrew." *Id.* "Peter attached to the letter an outline of the agreement noting that he would sell Andrew 5,293 shares at $144.71 and 117 shares, which would 'carry [Andrew] beyond 50 percent of the voting shares,' at $241.18." *Id.* (quoting Appellant's Trial App. p. 576). "The outline, signed by Peter, states: 'I agree to the sale of my shares of [TPO] Voting stock to Andrew C. Kesling as set forth above.'" *Id.* (quoting Appellant's Trial App. p. 577). "As part of the agreed-upon transaction between Andrew and Peter, Andrew agreed to pay one-half of Lewis's legal fee, and Lewis represented both Andrew and Peter." *Id.*

[8] "On May 21, 2004, Lewis sent a letter to Andrew with enclosed drafts of the two agreements to purchase stock, and on May 24, 2004, Lewis sent the same to Peter." *Id.*

> The drafts listed 'PETER C. KESLING' as Seller and 'ANDREW C. KESLING' as Buyer, stated that '[s]ince Buyer is an existing shareholder of [TPO], this sale and transfer of shares is permitted under the terms' of the Shareholder's Agreement, and noted that '[s]o long as Buyer is not in default in making the payments ... the Buyer shall be entitled to all rights to vote the shares deposited with the Escrow Agent,' which was NLKJ.

*Id.* (quoting Trial Ex. 11) (brackets in original).

[9] "Soon after, Andrew expressed concern to Lewis about what would happen with his TPO shares "if something happened to him," and on June 16, 2004,

Lewis sent Andrew a letter with enclosures consisting of amended purchase agreements and a draft of a Voting Trust Agreement (the "Voting Trust")." *Id.*

> The Voting Trust stated that it was an agreement "between ANDREW C. KESLING ("Shareholder"), and ANDREW C. KESLING ("[Voting] Trustee")" and that at its execution, "Shareholder shall assign and deliver all stock certificates representing shares of voting stock of [TPO] to the [Voting] Trustee, who shall cause the shares represented thereby to be transferred to the [Voting] Trustee as voting trustee on the books of" TPO, and indicated that this included the shares he was purchasing from Peter. Exhibit 17 at Paragraph 1. The Voting Trust stated that the Voting Trustee or any successor "shall have the exclusive right to vote upon such shares" and noted that in the event of death or disability of the Voting Trustee, "Peter C. Kesling or Charlene J. Kesling, or their survivor, shall serve as first alternate successor Trustee(s)," and that Lewis was named as second alternate successor Trustee. *Id.* at Paragraphs 2, 5.
>
> Also, language was added to the purchase agreements reading: "So long as Buyer is not in default in making the payments herein provided, the Buyer or any voting trustee designated by Buyer shall be entitled to all rights to vote the shares deposited with the Escrow Agent." Exhibit 13 at Paragraph 5. Also, a new paragraph titled "Death of Buyer " was added to the draft purchase agreements which stated that "[i]n the event of the death of the Buyer ... the shares are subject to purchase by [TPO] or its shareholders pursuant to the provisions of the Shareholder Agreement." *Id.* at Paragraph 7. Lewis included this paragraph "to remind everyone ... what would happen," because under the Shareholder Agreement, if Andrew died, "he couldn't pass the shares onto his children.... Or his wife.... Because she was not a shareholder." Transcript at 953.

*Id.* at 72-73 (emphases in original).

[10]   "On June 21, 2004, Andrew and Lewis spoke by telephone and discussed making amendments to the Trust." *Id.* at 73. "Andrew 'wanted to be more precise about what would happen to his shares' in the event of his death, and

also wanted language in the purchase agreements allowing for an opportunity to cure in the event of default in making installment payments." *Id.* (quoting Trial Tr. p. 955). "Based upon these concerns, Lewis made further changes to the purchase agreements in what would be the final drafts." *Id.* "Paragraph 7 was changed to read: 'Death of Buyer. In the event of the death of the Buyer ... the shares are subject to disposition as stated in the Declaration of Revocable Living Trust dated March 28, 2001, established by Buyer, as amended June 25, 2004.'" *Id.* (quoting Trial Exhibit 15A, B at Paragraph 7). "Also, the default provisions were changed to provide Andrew a thirty-day grace period and to allow Andrew to keep any shares he had paid for in the event of default." *Id.*

[11] "On June 25, 2004, Peter, his wife Charlene, Andrew, Lewis, and another attorney, James Kaminski, met at the NLKJ offices to finalize the sale of stock to Andrew." *Id.*

> Andrew, individually, and Peter signed both purchase agreements as amended (the "Stock Purchase Agreements"), and Lewis signed both agreements to accept his appointment as escrow agent. Andrew's Voting Trust was also executed; Andrew signed as both Shareholder and Trustee of the Voting Trust, Peter and Charlene signed as the First Successor Trustees, Lewis signed as the Second Successor Trustee, and Kaminski signed as the Third Successor Trustee. Overall, the meeting lasted thirty minutes or less.
>
> Further, on that same day Andrew signed the First Amendment to Declaration of Revocable Living Trust (the "Trust Amendment"), in which Andrew's "[v]oting and nonvoting shares of [TPO], together with any voting trust certificates representing voting shares of [TPO] held in voting trust" were allocated to the Marital Fund provided for in the Trust upon the death or incapacity of Andrew. Exhibit 16 at Paragraph 3.04(a)(iii). Also, Paragraph 3.06 states the following:

> ***Termination of Family Fund***—If my wife survives me, the Family Fund shall continue during the lifetime of my wife, Dorothy R. Kesling. Upon her death, or upon my death if she does not survive me, the Trustee shall take the following actions:
>
> (a) The Trustee shall offer to sell all voting and non-voting shares of [TPO], together with voting trust certificates ... held in any voting trust at the price according to a formula contained in the then existing Shareholders Agreement among [TPO] to the following existing shareholders:
>
> (i) To my father and mother, Peter C. Kesling and Charlene J. Kesling, or the survivor;
>
> (ii) If my father and mother are not living, then to the then living members of a class consisting of my uncle, David L. Kesling, my brother, Christopher K. Kesling, my sister, Emily Kesling, and my brother Adam W. Kesling, in equal shares.
>
> *Id*. at Paragraph 3.06. A similar provision for selling Andrew's TPO shares to his relatives was included in Paragraph 3.08 in the event of a Family Disaster. The Trust Amendment was signed by Andrew as Grantor, pursuant to the Grantor's power of amendment reserved in Paragraph 8.01 of the Trust.

*Id*. at 73-74 (emphases in original).

[12] "After the Stock Purchase Agreements were signed, Peter endorsed his stock certificates, which included certificates 56, 61, and 70, and provided them to his assistant, Lori Allen, and Allen prepared the back of the certificates pursuant to instructions which she received and noted that the new stock certificates were issued to 'Andrew C. Kesling Trust dated March 28, 2001.'" *Id*. at 74 (quoting Trial Exs. 36A, 36B, 36C). "Peter signed each of the certificates." *Id*. "Three stock certificates were issued in the name of the Trust: Certificate 176 reflected ownership of the 117 shares Andrew purchased at the premium rate, Certificate

177 reflected ownership of the other 5,293 shares Andrew purchased from Peter, and Certificate 178 reflected the 540 shares Andrew owned prior to the purchase from Peter." *Id.*

[13] Peter subsequently expressed concern during a February 28, 2006 meeting of the TPO Board of Directors regarding certain royalty payments paid to Andrew. *Id.* In light of the concerns raised by Peter, during a September 26, 2006 board meeting, "the directors adopted a resolution forming an investigating committee to determine whether TPO 'has a legal or equitable right or remedy to recover funds improperly paid by [TPO] to Andrew' and whether 'it is in the best interest of [TPO] to pursue that right or remedy,' and delineating the specificities of the task." *Id.* (quoting Trial Ex. 5 J) (brackets in original). "In November 2006, based on this investigation, Peter filed a complaint against Andrew which was removed to federal court." *Id.* During this lawsuit, it came to light that the stock purchased by Andrew was "apparently" transferred by Peter directly to Andrew's Trust. *Id.*

[14] On January 10, 2008, the Siblings filed a complaint naming Andrew, the Trust, Peter, and TPO as defendants. *Id.* at 75. In this complaint, the Siblings "requested that an 'order be entered declaring that [they] are entitled to purchase the 5,950 voting shares of TPO stock pursuant to the terms of the Shareholder Agreement....'" *Id.* (quoting Appellant's Trial App. p. 50). "In their complaint, the Siblings stated that, as a result of Peter's lawsuit in federal court, they were made aware that the 5,410 shares of stock sold to Andrew were not transferred to Andrew but rather to the Trust, that '[t]he Trust was not an

existing shareholder of TPO at the time the TPO shares were transferred into it,' that this was a violation of the Shareholder Agreement, and that therefore they were entitled to purchase the shares." *Id*. (quoting Appellant's Trial App. p. 46).

"On February 29, 2008, Peter, as part of his answer to the Siblings' complaint, asserted a cross-claim against Andrew requesting that the court rescind Stock Purchase Agreements executed on June 25, 2004 and return the stock to Peter because 'Peter would not have entered into the 2004 Transaction, giving Andrew voting control of the Company, had he known that Andrew had caused the Company to pay himself substantial royalties to which he was not entitled.'" *Id*. (quoting Appellant's Trial App. p. 74). "On September 5, 2008, Peter moved for leave to amend his answer and cross-claim, stating that, based upon discovery provided by Andrew on July 17, 2008, Peter 'learned that Andrew Kesling was not a shareholder of [TPO] in June, 2004. The discovery of this new fact is important because it forms an additional basis for Peter's actual and constructive fraud claims....'" *Id*. (quoting Appellant's Trial App. p. 265).

"On July 12, 2010, the court commenced a five-day bench trial in which evidence consistent with the foregoing was presented." *Id*. Following trial, the trial court found for Peter and against Andrew and the Siblings. *Id*. at 76-77. Andrew appealed the trial court's order.

[17] On appeal, we concluded that Andrew's Trust Declaration did not deprive him of his status as a shareholder of TPO and that Andrew, and not the Trust, was the legal owner of the shares in question. *Id*. at 83-86. In light of this conclusion, we further concluded that the trial court had abused its discretion in finding against Andrew and for Peter on the question of rescission. *Id*. at 86. We therefore reversed the judgment of the trial court and remanded the matter to the trial court for further proceedings. *Id*. at 87.

[18] On remand, the parties agreed that the issues before the court "present no new factual issues requiring the taking of additional evidence." Appellants' Appeal App. p. 43. The parties subsequently filed post-trial briefs.

[19] After taking the matter under advisement, the trial court entered its final judgment on March 28, 2014.[3] In reaching its final judgment, the trial court noted that "[t]he crux of the Siblings arguments is that Andrew did not comply with the 1999 Resolution when transferring Peter's voting shares and his own shares to the Trust, which the Siblings contend constituted a transfer to a non-shareholder, and therefore triggered the Siblings right to purchase those shares pursuant to the Shareholder Agreement." Appellants' Appeal App. p. 55. The trial court found that Andrew's transfer of the TPO shares to his Trust did not constitute a transfer to a non-shareholder, and as such, Andrew's conduct did

---

[3] We note that the portions of the trial court's final judgment relating to Peter's claims against Andrew are not at issue in the instant appeal. We will therefore focus our discussion of the trial court's final judgment to the portions relating to the Siblings' claims against Andrew.

not trigger the Siblings right to purchase the TPO shares at issue under the First Right of Refusal Provision of the Shareholders Agreement. The trial court further found that "[h]aving established that the Siblings are not entitled to the relief which they seek under the circumstances presented in this action, this Court now holds that the Siblings shall take nothing by way of their Complaint." Appellants' Appeal App. p. 60. The Siblings now appeal.

# Discussion and Decision

## I. Standard of Review

[20] Where, as here, the trial court enters findings and conclusions *sua sponte*, we apply the standard of review set out in Trial Rule 52. *Chidester v. City of Hobart*, 631 N.E.2d 908, 909 (Ind. 1994). "Under that rule, issues covered by the special findings will not be disturbed unless clearly erroneous. T.R. 52(A)." *Id.* at 910. "We determine whether the evidence supports the findings and the findings support the judgment, and we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment." *Id.* (citing *Indpls. Convention & Visitors Ass'n v. Indpls. Newspapers, Inc.*, 577 N.E.2d 208 (Ind. 1991)).

> "In deference to the trial court's proximity to the issues, 'we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment.'" [*Garling v. Ind. Dep't of Natural Res.*, 766 N.E.2d 409, 410 (Ind. Ct. App. 2002)] (quoting *Oil Supply Co. v. Hires Parts Serv., Inc.*, 726 N.E.2d 246, 248 (Ind. 2000)). "We do not reweigh the evidence, but only consider the evidence favorable to the trial court's judgment." *Id.*

*Bowyer v. Ind. Dep't of Natural Res.*, 944 N.E.2d 972, 983 (Ind. Ct. App. 2011). "Further, we review questions of law de novo, and afford no deference to the trial court in this regard." *Terry Weisheit Rental Props., LLC v. David Grace, LLC*, 12 N.E.3d 930, 935 (Ind. Ct. App. 2014) (citing *In re Estate of Owen*, 855 N.E.2d 603, 608 (Ind. Ct. App. 2006)).

## II. Whether the Trial Court Erred in Finding that the 2004 Transfer Did Not Trigger the Appellants' Right of First Purchase

[21] Appellants contend that the trial court erred in finding that Andrew's 2004 transfer of his shares of TPO, and the shares of TPO that he purchased from Peter, to his Trust did not trigger their right of first purchase. Again, the Shareholder Agreement provides the shareholders with a right of first purchase if one shareholder seeks to transfer their shares to a non-shareholder. The right to first purchase is triggered by an offer to transfer shares to a non-shareholder. Appellants claim that because Andrew's Trust was not a shareholder prior to the transfer, Andrew's 2004 transfer of shares of TPO to his Trust constituted a transfer to a non-shareholder which then triggered their right of first purchase. We disagree.

[22] In our prior opinion relating to this matter, we concluded that Andrew, not his Trust, retained ownership of the shares. *Kesling*, 967 N.E.2d at 86. Accordingly Andrew remained the shareholder of TPO. *Id*. In reaching this conclusion we stated that "there is no question that Andrew is the beneficial

and record owner of the shares of TPO, and indeed the Trust under Section 5.01(e) makes clear that Andrew is entitled to vote the shares." *Id*. at 83. We additionally stated that

> Andrew's Trust Declaration for estate planning purposes did not deprive Andrew of control of his property, and he continues to be responsible for the taxes thereon and his creditors can reach the shares. At any point, Andrew can revoke the Trust, in which case there would be no debate about where ownership lies.

*Id*. at 86.

[23] Appellants have presented no additional evidence which would cast doubt on our prior conclusion. Upon review, we reiterate our prior conclusion that even following Andrew's 2004 transfer of his shares to his Trust, Andrew, and not the Trust, remained the shareholder. Andrew, therefore, did not transfer his shares to a non-shareholder. Because there was no transfer of shares to a non-shareholder, the 2004 transfer did not trigger the first purchase rights set forth in the Shareholder Agreement. The trial court, therefore, did not err in reaching this same conclusion.

# III. Whether the Trial Court Erred in Finding that the Language of the Trust Listing Andrew's Wife, Dorothy, as a Potential Successor Trustee or Beneficiary of Andrew's Trust In the Event of Andrew's Death Constituted a Transfer of TPO Shares to a Non-Shareholder

The Siblings alternatively argue that the trial court erred in finding that the language of the Trust listing Dorothy as a potential successor trustee or beneficiary in the event of Andrew's death constituted a transfer of TPO shares to a non-shareholder. The Siblings further argue that this transfer triggered their right of first purchase set forth in the Shareholder Agreement. We cannot agree.

In considering this claim, the trial court found as follows:

> To begin, to the extent that Indiana law provides that equitable interest in property held in trust is vested in the trust beneficiaries, this Court is not persuaded by the Siblings arguments that Andrew's Trust Declaration, allowing him to direct payments from the Trust to Dorothy, amounts to an ownership interest in the Trust, belonging to Dorothy, which rises to the level of a transfer to a non-shareholder vis a vis the Shareholder Agreement. Further, while this Court agrees that Andrew's testamentary devise providing for a transfer of TPO shares to Dorothy or any other non-shareholder may constitute a transfer to a non-shareholder upon the death or incapacity of Andrew, this Court finds that such a claim is not yet ripe and is therefore not now properly before this Court. There simply was no evidence presented at trial, nor is there a present claim, that Andrew's wife is exerting any ownership of the stock in question. That she <u>may</u> do so at some uncertain further date is pure speculation, and grasps at the straws of events and circumstances that do not now exist.

Andrew's transfer of TPO shares to the revocable Trust, even as amended, do not negate the fact that for purposes of this case Andrew remains the owner of the TPO shares at issue. Nor do the terms of the Trust Declaration or the Trust Amendment negate the fact that Andrew remains the Grantor, Trustee, and lifetime beneficiary of the Trust. Furthermore, Andrew remains taxable for all income of the Trust and subject to claims against the Trust by his creditors. Even further, it remains that Andrew can revoke the Trust at any time, in which case there would be no debate about where ownership lies. That established, this Court cannot now render a ruling against Andrew based upon what the Siblings anticipate may be a future transfer of TPO shares to a non-shareholder at the time of Andrew's death or incapacitation. It follows that his Court holds that Andrew['s] transfer of TPO shares to the Trust, as amended, does not constitute a transfer to a non-shareholder.

Appellants' Appeal App. p. 58 (emphasis in original, brackets added).

[26] We find the trial court's analysis in this regard to be sound. Although the Siblings argue that Dorothy received a vested interest in the TPO shares at the time Andrew transferred the shares to his Trust, *see generally Matter of Walz*, 423 N.E.2d 729, 733 (Ind. Ct. App. 1981) (providing that "[w]hen the inter vivos settlor creates his trust and transfer property thereto, he creates a present interest in the beneficiaries"), the clear language of the Trust did not create any present ownership interest in the shares of TPO that are at issue in the instant appeal.

[27] Again, in our prior opinion relating to this matter, we concluded that Andrew, not his Trust, retained ownership of the shares. *Kesling*, 967 N.E.2d at 86. As the trial court found, there is no evidence in the record that indicates that Dorothy or any other non-shareholder is exerting any ownership of the shares

of TPO. In fact, the record demonstrates that Andrew, and Andrew alone, is exerting full ownership of the shares in question. Andrew remains the Grantor, Trustee, and lifetime beneficiary of the Trust. He remains liable for all taxable income generated from the Trust and subject to claims against the Trust by his creditors. Further, he has retained and exercises full voting rights over the shares in question. Furthermore, Andrew has the power to revoke the Trust at any time, in which case there would be no debate as to where ownership of the shares at issue lies. Accordingly, we agree with the trial court that Andrew's transfer of the TPO shares in question to his Trust does not constitute a transfer to a non-shareholder.[4] As such, the transfer did not trigger the first purchase rights set forth in the Shareholder Agreement.[5]

[28] The judgment of the trial court is affirmed.

Vaidik, C.J., and Kirsch, J., concur.

---

[4] To the extent that the Siblings argue that Andrew's transfer of the shares of TPO at issue to his Trust violates the "strong public policy" allowing shareholders in a closely held corporation to choose with whom they associate, we note that because Andrew, a shareholder before the transfer, remains the sole shareholder with respect to the shares at issue after the transfer there has been no change in the identity of the individuals associated with one another via their position as shareholders.

[5] We note that TPO raised an alternative argument on cross-appeal on the chance that we reversed the trial court's judgment in favor of TPO. However, because we affirm the judgment of the trial court, we need not consider the alternative argument raised by TPO on cross-appeal.